# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ROBERT MITCHELL JENNINGS** | § | |
|     **Petitioner** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | **CIVIL NO. _____** |
| **DIRECTOR** | § | **Death Penalty Case** |
| **OF THE TEXAS DEPARTMENT** | § | |
| **OF CRIMINAL JUSTICE,** | § | |
| **CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION** | § | |
|     **Respondent** | § | |

## PETITION FOR A WRIT OF HABEAS CORPUS
## OF A PERSON IN STATE CUSTODY

**Randy Schaffer**
**State Bar No. 17724500**
**Federal ID No. 950**

**The Schaffer Firm**
**1301 McKinney, Suite 3100**
**Houston, Texas 77010**
**(713) 951-9555**
**(713) 951-9854 (facsimile)**
**noguilt@swbell.net (e-mail)**

**Attorney for Petitioner**
**ROBERT MITCHELL JENNINGS**

# SUBJECT INDEX

**Page**

CUSTODY ........................................................................................... 1

CHRONOLOGY OF THE PROCEEDINGS ................................................... 1

ISSUE PRESENTED ........................................................................... 2

STANDARD OF FEDERAL HABEAS CORPUS REVIEW ......................... 2

STATEMENT OF FACTS ..................................................................... 3

GROUND FOR RELIEF ....................................................................... 5

THE STATE COURT DECISION THAT COUNSEL WAS
EFFECTIVE AT THE PUNISHMENT STAGE WAS
CONTRARY TO OR INVOLVED AN UNREASONABLE
APPLICATION OF SUPREME COURT PRECEDENT OR
WAS BASED ON AN UNREASONABLE
DETERMINATION OF THE FACTS IN LIGHT OF THE
EVIDENCE PRESENTED.

A.   The Standard Of Review.................................................. 5

B.   Deficient Performance..................................................... 7

    1.   Counsel failed to discover and present mitigating
       evidence of petitioner's mental impairment. ..................... 7

    2.   Counsel failed to present evidence of petitioner's
       disadvantaged background.................................................. 18

    3.   Counsel argued during summation that he could not
       quarrel with a death sentence ........................................... 25

C.   Prejudice ....................................................................... 27

CONCLUSION .................................................................................. 36

**Page**

VERIFICATION.................................................................................................   37

# TABLE OF AUTHORITIES

**Page**

## Cases

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007) ............................................   34

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) ....................... 17, 18, 23, 34

Armstrong v. Dugger, 833 F.2d 1430 (11th Cir. 1987) ............................ 15, 22, 29

Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991) ......................................17, 22

Boyd v. State, 811 S.W.2d 105 (Tex. Crim. App. 1991)...................................   6

Brewer v. Aiken, 935 F.2d 850 (7th Cir. 1991)...................................................15, 22

Brewer v. Quarterman, 550 U.S. 286 (2007)......................................................   34

California v. Brown, 479 U.S. 538 (1987)...........................................................   12

Correll v. Ryan, 465 F.3d 1006 (9th Cir. 2006) ......................................... 17, 22-23

Craig v. State, 847 S.W.2d 434 (Tex. App.—El Paso 1993, no pet.)...............   27

Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991) ..................................... 17, 22

DeGarmo v. State, 691 S.W. 2d 657 (Tex. Crim. App. 1985).........................   10

Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989), vacated, 500 U.S. 901
             (1991), rev'd, 946 F.2d 1443 (9th Cir. 1991),
             vacated, 506 U.S. 935 (1992), aff'd in part and
             remanded, 16 F.3d 981 (9th Cir. 1994)................ 16-17, 34

Douglas v. Woodford, 316 F.3d 1079 (9th Cir. 2003) ..................................... 14, 34

Eddings v. Oklahoma, 455 U.S. 104 (1982).......................................................   13

Ex parte Gonzales, 204 S.W.3d 391 (Tex. Crim. App. 2006).........................   22

**Page**

Frierson v. Woodford, 463 F.2d 982 (9th Cir. 2006) ...................................... 17

Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995) ..................................................... 17

In re R.D.B., 20 S.W.3d 255 (Tex. App.—Texarkana 2000, no pet.) .............. 18

Kyles v. Whitley, 514 U.S. 419 (1995) .............................................................. 7

Lambright v. Schriro, 490 F.3d 1103 (9th Cir. 2007)...................................... 18

Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992) ................................................. 17

Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) ................................. 17, 30, 34

McMann v. Richardson, 397 U.S. 759 (1970)................................................... 5

Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988)...................................... 16, 22

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) ............................................. 15

Outten v. Kearney, 464 F.3d 401 (3d. Cir. 2005)............................................. 17

Penry v. Johnson, 532 U.S. 782 (2001) ............................................................ 33

Penry v. Lynaugh, 492 U.S. 302 (1989) ........................................................... 33

Powell v. Alabama, 287 U.S. 45 (1932) ............................................................ 5

Rompilla v. Beard, 545 U.S. 374 (2005) ..................................................... 14, 30, 31

Smith v. Texas, 550 U.S. 297 (2007)................................................................. 34

Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988) ........................................... 15

Strickland v. Washington, 466 U.S. 668 (1984)........................................ 6, 13, 32

**Page**

Summerlin v. Schriro, 427 F.3d 623 (9th Cir. 2005).........................................   17

Virgil v. Dretke, 446 F.3d 598 (5th Cir. 2006)..................................................   24

Wiggins v. Smith, 539 U.S. 510 (2003)...........................................   7, 13, 14, 30, 32

Wiley v. Sowders, 647 F.2d 642 (6th Cir. 1981)...............................................   27

Williams v. Taylor, 529 U.S. 362 (2000) ....................................................   2, 13, 30

Woodson v. North Carolina, 428 U.S. 280 (1976) ...........................................   13

## Constitutional Provisions

U.S. CONST. amend. VI.......................................................................................   5

U.S. CONST. amend. XIV ....................................................................................   5

## Federal Statute

28 U.S.C. § 2254(d)(1).......................................................................................   2

## State Statute

TEX. CRIM. PROC. CODE ANN. art. 37.071(e) (West 1988)..............................   7, 32

## CUSTODY

Petitioner is illegally restrained of his liberty in the Texas Department of Criminal Justice, Correctional Institutions Division, pursuant to a judgment of the 208th District Court of Harris County.

## CHRONOLOGY OF THE PROCEEDINGS

Petitioner pled not guilty to capital murder in cause number 506814 in the 208th District Court of Harris County.  The jury convicted him and answered the statutory special issues in the affirmative, and the court sentenced him to death on July 13, 1989.  Connie Williams and Grant Hardeway represented him.

The Texas Court of Criminal Appeals affirmed the conviction in an unpublished opinion issued on January 19, 1993.  The Supreme Court denied certiorari on October 4, 1993.  Jennings v. State, No. AP-70,911 (Tex. Crim. App.), cert. denied, 510 U.S. 830 (1993).

Petitioner filed a habeas corpus application on September 20, 1996, and supplemented it on June 16, 2001.  The trial court entered findings of fact and conclusions of law recommending that relief be denied on January 22, 2006.  The Court of Criminal Appeals denied relief in an unpublished opinion issued on November 26, 2008.  Ex parte Jennings, Nos. AP-75,806 and 75,807, 2008 WL 5049911 (Tex. Crim. App. 2008).  Petitioner timely filed a certiorari petition in the Supreme Court on January 23, 2009.

The present petition, to be timely under the AEDPA, must be filed by June 26, 2009.

## ISSUE PRESENTED

Whether the state court decision that trial counsel was effective at the punishment stage was contrary to or involved an unreasonable application of Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented.

## STANDARD OF FEDERAL HABEAS CORPUS REVIEW

A federal habeas court must defer to the state court decision unless it was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if the state court's conclusion is opposite to that reached by the Supreme Court on a question of law or the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result. Williams v. Taylor, 529 U.S. 362 (2000). A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case or it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it

should apply.  Id. at 408, 413.  The federal court must decide whether the state court's application of the law was objectively unreasonable.  Id. at 409.

## STATEMENT OF FACTS

### A.    The Guilt-Innocence Stage

Houston Police Department vice officers M.L. Sistrunk and Elston Howard were assigned to enforce a city ordinance regulating the licensing and operation of sexually oriented businesses (33 R.R. 34-36).  They went to the Empire Bookstore, dressed in civilian clothing, about 11:00 p.m. on July 19, 1988 (33 R.R. 34, 37-38, 52-53).  Sistrunk paid an admission fee and watched a sexually explicit movie in a booth (33 R.R. 55, 75).  As Sistrunk left the store, Howard, wearing a police raid jacket over his civilian clothing, and the clerk, Larry Overholt, were standing behind the counter (33 R.R. 78-80).[1]

Overholt testified that Howard filled out the paperwork to arrest him because the store did not have a proper permit and called for a patrol car to transport him to jail (33 R.R. 106, 111).  Petitioner entered the store, pulled a gun, approached Howard, and shot him twice in the neck and, after a brief struggle, twice more as he lay face down on the floor (33 R.R. 112-19).  Petitioner demanded money, and Overholt turned over his wallet and the money from the cash register (33 R.R. 120-21).  Petitioner ran out of the store (33 R.R. 124).

---

[1] Sistrunk drove to a nearby restaurant and bought food after he left the bookstore (33 R.R. 84-85).

Howard was shot twice in the head, once in the back, and once in the shoulder (34 R.R. 338).  Three of the wounds were fatal (34 R.R. 349, 363-64).

Petitioner's accomplice, David Harvell, was waiting outside in a car (35 R.R. 563-64).  As they drove away, petitioner told Harvell that he shot someone in the store (35 R.R. 565).  Minutes later, Harvell shot petitioner, who dove out of the passenger window and ran away (35 R.R. 565-66).

Petitioner was admitted to a hospital for treatment of a gunshot wound to his hand on July 20 at 1:40 a.m. (35 R.R. 582-85).  The police arrested him in the hospital that night (34 R.R. 376-81).  He gave a written confession that his gun went off when Howard tried to tackle him during the robbery (35 R.R. 554, 563; 36 R.R. 862).

## B.    The Punishment Stage

The State presented evidence at the punishment stage regarding petitioner's criminal history.  He was declared delinquent at age 14 and placed on probation in 1972 (39 R.R. 167-71; SX 109).  He was sent to trade school at age 15 as a condition of probation in 1973 (39 R.R. 171-73; SX 110).  He was sent to a juvenile facility at age 16 for a probation violation in 1974 (39 R.R. 173-75; SX 111).  He was convicted of aggravated robbery at age 17 and sentenced to five years in prison in 1975 (39 R.R. 177-81; SX 115).  He was convicted of two aggravated robberies and burglary of a habitation at age 20 and sentenced to

concurrent 30 year sentences in 1978 (39 R.R. 181-84; SX 115).   He was "handled" for 13 disciplinary violations (eight "minor" and five "major") in prison between June of 1979 and October of 1984 (39 R.R. 120-123).   He committed five aggravated robberies in addition to the primary offense at age 30 after he was released from prison in May of 1988 (39 R.R. 16-19, 25-29, 35-41, 72-79, 85-97).

George Burrell, a Harris County Sheriff's Office chaplain, was the only defense witness at the punishment stage (39 R.R. 185-86).   Burrell first met petitioner in the jail in July of 1988, saw him two or three days per week, and felt that he had "changed" since they met (39 R.R. 187-89).   Burrell did not know of any disciplinary violations committed by petitioner in the jail and did not believe that he was "incorrigible" (39 R.R. 188, 190-91).

### GROUND FOR RELIEF

**THE STATE COURT DECISION THAT COUNSEL WAS EFFECTIVE AT THE PUNISHMENT STAGE WAS CONTRARY TO OR INVOLVED AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT OR WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED.**

## A.    The Standard Of Review

Petitioner had a right to the effective assistance of counsel at trial.   U.S. CONST. amends. VI and XIV; Powell v. Alabama, 287 U.S. 45 (1932).   Counsel must act within the range of competence demanded of counsel in criminal cases. McMann v. Richardson, 397 U.S. 759 (1970).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court addressed the federal constitutional standard to determine whether counsel rendered reasonably effective assistance.  The defendant first must show that counsel's performance was deficient; that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense; that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result.

The defendant must identify specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The reviewing court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance.  Ultimately, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.

The Strickland standard applies to the determination of ineffective assistance of counsel at the punishment stage of a capital murder trial.  Boyd v. State, 811 S.W.2d 105, 109 (Tex. Crim. App. 1991).  Petitioner need not show a reasonable probability that, but for counsel's errors, he would have received a life sentence.

6

Rather, the issue is whether he received a fair trial that produced a death sentence worthy of confidence.  Cf. Kyles v. Whitley, 514 U.S. 419, 434 (1995).  Texas law provided in 1989 that, if the jurors did not agree on affirmative answers to the special issues, the court had to impose a life sentence.  TEX. CODE CRIM. PROC. art. 37.071(e) (West 1988).  Thus, prejudice is established in a capital case if there is a reasonable probability that one juror would have persisted in a negative answer to a special issue based on the mitigating evidence.  Wiggins v. Smith, 539 U.S. 510, 537 (2003).

## B.   Deficient Performance

### 1.   Counsel failed to discover and present mitigating evidence of petitioner's mental impairment.

A district court ordered a psychological evaluation of petitioner after he was charged with two aggravated robberies and burglary of a habitation in 1978.  Dr. J.M. Bloom, a psychologist with the Harris County Psychiatric Hospital, prepared a report on June 21, 1978 (1 H.R. 46-49).[2]  The pertinent portion states (1 H.R. 48):

> RESULTS:
>
> On the Ammons Test, Mr. Jennings obtained an IQ of 65, which is in the mild mentally retarded range of intelligence.
>
> On the Bender Gestalt, there is evidence of organic brain dysfunction, mild degree.

---

[2] Dr. Bloom's report was in the district clerk's files on the 1978 cases (2 H.R. 389-90).

Lead counsel Connie Williams testified by affidavit in 1996 regarding the defense preparation for the punishment stage (1 H.R. 40-43).[3]  The defense did not conduct a "mitigation investigation" to discover evidence to offer in support of a life sentence because Williams did not fully appreciate the concept of mitigating evidence as it related to the special issues (1 H.R. 40-41).  He prepared for the punishment stage by reviewing the penitentiary packets on the prior convictions (which contain the judgments and sentences) rather than the district clerk's files and by interviewing petitioner, his mother, and the jail chaplain (1 H.R. 40-41). He did not investigate whether petitioner had any mental impairment that might have contributed to the commission of the offense or that would mitigate the punishment (1 H.R. 41).  He did not know of any prior psychological evaluation, much less that Dr. Bloom prepared a report reflecting that petitioner demonstrated mild mental retardation and organic brain dysfunction in 1978.  He did not consult with a psychologist or request a psychological evaluation because he was not aware of Dr. Bloom's report and lacked the expertise to determine from his observations that petitioner might be mentally impaired.  His failure to investigate petitioner's mental condition and present evidence of any mental impairment was not strategic; rather, it was a consequence of not knowing about any diagnosed

---

[3]  Williams had defended two capital murder cases at the time of petitioner's trial, one as lead counsel and one as "second chair" (1 H.R. 40).

mental impairment and petitioner not exhibiting any mental aberration (1 H.R. 41-42).  Had he read Dr. Bloom's report, he would have requested a psychological evaluation, presented evidence of any mental impairment, and argued that petitioner's diminished mental condition made him less morally culpable for his conduct and constituted a reason to spare his life (1 H.R. 42).[4]

Petitioner was psychologically evaluated and tested in 1996 during the state habeas proceeding.  Dr. Meyer Proler prepared a report regarding a Quantitative EEG (QEEG) that suggested that petitioner had a post-concussive syndrome (1 H.R. 72-73).  Dr. Theodore Simon prepared a report regarding a SPECT-Scan in which abnormal findings in petitioner's frontal lobes, parietal lobes, and left temporal lobe "support the contention" that his brain has been injured (1 H.R. 75).

Dr. Windel Dickerson, a psychologist, prepared a report regarding a neuropsychological examination of petitioner in 1996 and the significance of the findings made by Drs. Bloom, Proler, and Simon.  The neuropsychological examination did not confirm that petitioner is mentally retarded, but it suggested that he has "learning problems of a fairly subtle sort, difficulties with emotional stability and difficulty with impulsive behavior" (1 H.R. 68).  The results of the QEEG and SPECT-Scan indicate that, at some point, he received a blow to the

---

[4] Co-counsel Hardeway gave a similar affidavit in 1996 (1 H.R. 44-45).

head that resulted in organic brain dysfunction.[5]  His prison medical records do not reveal any incident that could account for these findings (1 H.R. 67).  Petitioner suffers from periods in which impulsive action overcomes his capacity for reason and foresightful action; his capacity for emotional control and self-inhibition is less than that of an unimpaired person; his condition has a demonstrable physical basis; and these findings could have been made in 1989 had he been tested (1 H.R. 68).

Petitioner's mother, Flora Jennings, testified by affidavit in 1996 that he had two head injuries that required treatment at a hospital during childhood.  He was in an auto accident in which the car rolled over several times; on another occasion, he was hit in the head with a baseball bat (1 H.R. 77-78).  His sister, Carla Jennings, testified by affidavit in 1996 regarding the auto accident (1 H.R. 79-80).

Edward Mallett, a criminal defense lawyer, testified by affidavit in 1996 regarding his representation of Roger DeGarmo (1 H.R. 81-83).  DeGarmo was convicted of capital murder and sentenced to death.[6]  A federal court ordered a new trial because of prosecutorial misconduct.  Mallett and co-counsel Greg Gladden

---

[5] Brain "damage" is an injury that causes necrosis or scarring of the tissue and is manifested by anatomical problems.  Brain "dysfunction" means that the brain is not working properly; it can occur without any anatomical problems.  Brain damage ordinarily produces brain dysfunction.  Petitioner has both.

[6] DeGarmo kidnapped a young woman in Houston, locked her in the trunk of his car, drove her to another county, and shot her in the head.  DeGarmo v. State, 691 S.W.2d 657, 659 (Tex. Crim. App. 1985).  He achieved lasting infamy when he testified at the punishment stage that he was guilty and that he would kill or have someone kill each juror or members of their families if he were not sentenced to death.  Id. at 660.

hired Dr. Dickerson as a consulting expert to help them prepare for the retrial (1 H.R. 81). Dr. Dickerson concluded that DeGarmo, although competent and sane, exhibited symptoms consistent with temporal lobe disorder, a form of organic brain damage, and suggested that specialists conduct tests (1 H.R. 82). The results of a QEEG and a PET-Scan demonstrated that DeGarmo suffers from temporal lobe and frontal lobe dysfunction. The defense presented that evidence at the punishment stage. Based on the jury's answer to the "mitigation" special issue, DeGarmo received a life sentence (1 H.R. 83).

In petitioner's case, the State countered that, even had counsel read Dr. Bloom's report, they would not have been obligated to investigate petitioner's mental condition because Dr. Bloom ultimately concluded that he was malingering in order to delay the proceedings (1 H.R. 48-49). Dr. John Nottingham, a psychiatrist at the Harris County Psychiatric Hospital, also examined petitioner in 1978 and agreed with that diagnosis (1 H.R. 243-44).[7] Furthermore, Dr. Jerome Brown examined petitioner prior to trial in 1989 and concluded that he was sane and competent (1 H.R. 245-47).[8]

The State hired Dr. Victor Scarano, a psychiatrist, in 2002 to review the evidence developed in the habeas proceeding and prepare a report (1 H.R. 336-

---

[7] Dr. Nottingham observed that petitioner's speech demonstrated that he is "slow" and that his syntax is simple (1 H.R. 244).

[8] Petitioner did not cooperate with Dr. Brown during the examination (1 H.R. 245-47).

47).[9]   Dr. Scarano concluded that petitioner malingered a mental disease or disorder in 1978; that he did not suffer from organic brain dysfunction at the time of the primary offense; and that his conduct during the offense was controlled and deliberate rather than impulsive (1 H.R. 336).[10]

The trial court adopted the State's proposed findings of fact and conclusions of law verbatim (2 H.R. 410-28).  It concluded that counsel was not ineffective in failing to investigate petitioner's mental condition because the evidence did not demonstrate that he suffers from organic brain dysfunction (2 H.R. 414, 425). Petitioner objected that the court did not resolve whether counsel breached their duty to investigate his mental condition and whether, had they presented the evidence developed in the habeas proceeding, there is a reasonable probability that one juror would have persisted in a negative answer to a special issue, resulting in a life sentence (2 H.R. 431-33).

The United States Constitution prohibits imposition of the death penalty without adequate consideration of facts that justify a sentence less than death. California v. Brown, 479 U.S. 538, 541 (1987).  Consideration of mitigating evidence is a "constitutionally indispensable part of the process of inflicting the

---

[9] Dr. Scarano billed the State $4,050 at the rate of $270 per hour to review the records and prepare the report (1 H.R. 86-87).

[10] Dr. Scarano considered it significant that petitioner obtained a GED and college credits in prison and acquired skills as a butcher and a barber (1 H.R. 342).  He concluded that the results of the QEEG and SPECT-Scan should not alone be used to make a diagnosis of organic brain dysfunction due to traumatic brain injury (1 H.R. 337, 345-47).

penalty of death."  Woodson v. North Carolina, 428 U.S. 280, 304 (1976).  The sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence.  Eddings v. Oklahoma, 455 U.S. 104, 114 (1982).

Because the defendant in a capital case has a constitutional right to present mitigating evidence, defense counsel has a duty to investigate his background. Wiggins v. Smith, 539 U.S. at 521-23.  Counsel in a capital case has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland v. Washington, 466 U.S. at 690-91.  Thus, the threshold question is whether counsel's failure to investigate petitioner's mental condition was reasonable.  See Wiggins v. Smith, 539 U.S. at 523.

The offense was committed in 1988, and the trial took place in 1989. Strickland clearly established in 1984 that counsel has a duty to investigate and present mitigating evidence in a capital case.  See Williams v. Taylor, 529 U.S. at 390.  The ABA Standards for Criminal Justice set forth this duty in 1980.  Id. at 396.  Thus, counsel's failure to investigate petitioner's mental condition violated the prevailing professional standards in effect at the time of the trial in 1989.  See Wiggins v. Smith, 539 U.S. at 524.  Furthermore, the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases in effect in 1989 provided that the investigation "should comprise efforts to discover all reasonably

available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Id. at 524. Counsel was ineffective in Wiggins because they abandoned their investigation of the defendant's background after acquiring only rudimentary knowledge of his history from a narrow set of sources. Id.

Petitioner's counsel prepared for the punishment stage only by reviewing the penitentiary packets on the prior convictions and interviewing petitioner, his mother, and the jail chaplain (1 H.R. 41, 44). Had counsel reviewed the district clerk's files on the prior convictions, they would have discovered Dr. Bloom's report that petitioner demonstrated mild mental retardation and organic brain dysfunction in 1978 (1 H.R. 48). Their failure to review the district clerk's files on the prior convictions to look for any mitigating evidence violated the ABA Standards then in effect. See Rompilla v. Beard, 545 U.S. 374, 385-87 (2005); Douglas v. Woodford, 316 F.3d 1079, 1086-87 (9th Cir. 2003) (counsel ineffective in failing to review files on prior convictions and discover report of psychological evaluation reflecting that defendant was mentally impaired and had possible organic brain damage).

Williams had defended only one capital murder case as lead counsel and one as "second chair" at the time of petitioner's trial (1 H.R. 40). He did not consult with a psychologist or request a psychological evaluation because he did not

appreciate the concept of mitigating evidence, was not aware of Dr. Bloom's report, and lacked the expertise to determine that petitioner might be mentally impaired (1 H.R. 40-41).  His inexperience in preparing for a capital sentencing proceeding does not excuse his failure to investigate petitioner's mental condition. See Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987).[11]

Counsel deny that they made a strategic decision not to investigate petitioner's mental condition (1 H.R. 41-42, 44).  Counsel's failure to investigate the mental condition of a defendant of low intelligence in a capital case can never be sound strategy.  Brewer v. Aiken, 935 F.2d 850, 858 (7th Cir. 1991) (counsel ineffective in failing to investigate and present evidence of defendant's brain damage from blows to head and low IQ); Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999).  Counsel acknowledge that, had they read Dr. Bloom's report, they would have requested a psychological evaluation, offered evidence of any mental impairment, and argued that petitioner's diminished mental condition made him less morally culpable for his conduct and constituted a reason to spare his life (1 H.R. 42, 44).  Dr. Dickerson concluded that the findings regarding petitioner's brain injury and organic brain dysfunction could have been made in 1989 had he

---

[11] The State obtained an affidavit from Williams in 2003 that there was "nothing about [petitioner] to indicate that he suffered from a mental illness or mental retardation" (1 H.R. 352). This observation is meaningless in view of Williams's acknowledgment in 1996 that he lacked the expertise to determine that petitioner might be mentally impaired.  Furthermore, that Dr. Brown concluded in 1989 that petitioner was sane and competent to stand trial did not excuse counsel's failure to investigate petitioner's mental condition.  See Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir. 1988).

been tested (1 H.R. 68).  Thus, counsel's failure to investigate petitioner's mental condition and present this mitigating evidence could not have been sound strategy. See Middleton v. Dugger, 849 F.2d 491, 494 (11th Cir. 1988) (failure to investigate defendant's mental condition was not sound strategy where counsel acknowledged that, had he known about prior psychological evaluation, he would have presented evidence of mental impairment, psychiatric hospitalization, and low IQ).

Reasonably competent counsel would have reviewed the district clerk's files on petitioner's prior convictions to prepare for any aggravating evidence and look for any mitigating evidence.  Had counsel done so, they would have discovered Dr. Bloom's report that petitioner demonstrated mild mental retardation and organic brain dysfunction in 1978.  Even though Dr. Bloom and Dr. Nottingham ultimately concluded that he was malingering, counsel should have (and admittedly would have) requested a psychological evaluation, which inevitably would have led to a QEEG and a SPECT-Scan.  Counsel could have called doctors to testify that petitioner sustained a head injury that resulted in organic brain dysfunction that could have contributed to, if not caused, his criminal conduct.  Their failure to investigate petitioner's mental condition and present mitigating evidence of his mental impairment constituted deficient performance.  Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989), vacated, 500 U.S. 901 (1991), rev'd, 946 F.2d 1443 (9th

Cir. 1991), <u>vacated</u>, 506 U.S. 935 (1992), <u>aff'd in part and remanded</u>, 16 F.3d 981 (9th Cir. 1994) (mental impairment characterized by episodes of uncontrollable violence); <u>Cunningham v. Zant</u>, 928 F.2d 1006 (11th Cir. 1991) (skull fracture in auto accident and evaluation of mild mental retardation); <u>Blanco v. Singletary</u>, 943 F.2d 1477 (11th Cir. 1991) (organic brain dysfunction; low IQ; poor contact with reality; and psychotic, paranoid and depressive tendencies); <u>Loyd v. Whitley</u>, 977 F.2d 149 (5th Cir. 1992) (possible frontal lobe dysfunction);[12] <u>Glenn v. Tate</u>, 71 F.3d 1204 (6th Cir. 1995) (global brain damage and low IQ);[13] <u>Lockett v. Anderson</u>, 230 F.3d 695 (5th Cir. 2000) (organic brain damage in frontal and/or temporal lobes and personality disorder); <u>Summerlin v. Schriro</u>, 427 F.3d 623 (9th Cir. 2005) (organic brain impairment, paranoia, and personality disorders); <u>Frierson v. Woodford</u>, 463 F.3d 982 (9th Cir. 2006) (head injuries, possible organic brain dysfunction, and low IQ); <u>Outten v. Kearney</u>, 464 F.3d 401 (3d. Cir. 2005) (neurological damage, low IQ, and poor school performance); <u>Correll v. Ryan</u>, 465 F.3d 1006 (9th Cir. 2006) (psychological problems); <u>Anderson v. Sirmons</u>, 476 F.3d 1131 (10th Cir. 2007) (brain damage from head injuries and low

---

[12] A frontal lobe dysfunction "would be expected to have an impact on judgment…." <u>Lloyd v. Whitley</u>, 977 F.2d at 156.

[13] The court set aside the death sentence imposed for the murder of a police officer. <u>Glenn v. Tate</u>, 71 F.3d at 1205.

IQ);[14] <u>Lambright v. Schriro</u>, 490 F.3d 1103 (9th Cir. 2007) (anti-social personality disorder);[15] <u>cf</u>. <u>In re R.D.B.</u>, 20 S.W.3d 255 (Tex. App.—Texarkana 2000, no pet.) (failure to request that expert determine whether juvenile's frontal lobe injury caused his anti-social behavior).

The Texas Court of Criminal Appeals acknowledged that trial counsel "may well have performed deficiently" in failing to investigate and present this evidence. <u>Ex parte Jennings</u>, 2008 WL 5049911 at *2.

## 2.    Counsel failed to present evidence of petitioner's disadvantaged background.

The defense obtained a hearing outside the presence of the jury and proffered petitioner's testimony that he was raised in an impoverished home by a drug-addicted mother who had been convicted of theft; that he was often left without adult supervision; that he was a poor student who dropped out of school in the ninth grade; and that he was too intoxicated to deliberate at the time of the offense (39 R.R. 196-99).   The court denied petitioner's motion to restrict the cross-examination to the primary offense (39 R.R. 198-200).   Thereafter, counsel did not offer any testimony before the jury regarding petitioner's disadvantaged

---

[14] Brain deficits "can be perceived by lay persons as 'meanness' or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system." <u>Anderson v. Sirmons</u>, 476 F.3d at 1144.

[15] The defense presented only one witness at the punishment stage, who testified regarding the defendant's behavior in jail. <u>Lambright v. Schriro</u>, 490 F.3d at 1119.  In like manner, counsel called only the jail chaplain to testify about petitioner's behavior in jail.

background.

Petitioner's mother, Flora Jennings, and his sister, Carla, testified by affidavit in 1996 regarding his social history (1 H.R. 77-80).  Mrs. Jennings was raped at age 16, became pregnant, and gave birth to petitioner at age 17 (1 H.R. 77).  She frequently told him that he was conceived as a result of a "date rape" and that she could not complete her education because of him.  According to Carla, Mrs. Jennings frequently told him that she did not want him (1 H.R. 79).

Mrs. Jennings sent petitioner to live with her mother and grandmother on a farm outside of Houston because she could not support him.  She married in 1962, and petitioner returned to Houston two years later (when he was about six years old) to live with the family.  Petitioner's stepfather was seldom at home.  Mrs. Jennings soon divorced him, and petitioner had little male influence.  Mrs. Jennings lived with and cared for an elderly woman during the week.  Petitioner and Carla lived in an apartment, supervised by an older cousin; they received little adult supervision or love.  Mrs. Jennings used drugs when she came home on the weekends  The family was poor and had only the bare essentials, such as food and clothing (1 H.R. 77, 79).

Petitioner performed poorly in special education classes, dropped out of school in the ninth grade, and began to use drugs.  He was in and out of reform school and prison from the age of 15.  He had no stable influences when he was at

home (1 H.R. 78, 80).

Williams spoke to Mrs. Jennings and Carla a couple of times but did not question them much about petitioner's background or ask them to testify. They would have testified to the facts set forth in their affidavits (1 H.R. 78-80).

Williams testified by affidavit in 1996 that he was informed that petitioner was raised by a drug-addicted mother and had a disadvantaged background, a limited education, and abused alcohol. He decided not to offer this evidence after the court denied his motion to restrict the cross-examination of petitioner (1 H.R. 41).

The State obtained an affidavit from Williams in 2003 that he did not call Mrs. Jennings or Carla because he did not think that their testimony would be beneficial, as Mrs. Jennings was not sympathetic to petitioner and Carla was relatively young when petitioner left home (1 H.R. 351).[16] The State suggested in its answer to the habeas corpus application that information contained in police offense reports and witness statements not admitted in evidence provided additional reasons not to call them (1 H.R. 223-25). Petitioner's girlfriend, Wanda Taylor, told the police that Mrs. Jennings placed a wallet containing money stolen in the primary offense in a drawer at Carla's house and that she had a bad cocaine

---

[16] Petitioner was sent to trade school in 1973, to a juvenile facility in 1974, and to prison in 1975 (39 R.R. 171-81). Carla was born on May 9, 1962 (1 H.R. 304). She was 11 years old when he first left home. Thus, she was old enough to perceive and remember these events.

habit and may have gone to buy cocaine after visiting petitioner at the hospital. The police offense report reflects that Mrs. Jennings appeared to be high when she gave her statement and that she told the officer that she smoked a cocaine-laced marijuana cigarette earlier that day; he arrested her for possession of a controlled substance after she allowed him to search her purse.  Petitioner told the police that Carla took him to the hospital after he was shot and that he gave his mother and Carla money from the robberies.   Mrs. Jennings and Carla told the probation officer who prepared the 1978 presentence investigation report that petitioner was very moody and tended to withdraw; was "mixed-up"; was constantly truant from school and in trouble with the law as a juvenile; and acted strange.

The trial court concluded that Williams did not perform deficiently in failing to present evidence of petitioner's disadvantaged background where he did not believe that the testimony of Mrs. Jennings and Carla would be beneficial (2 H.R. 416, 426).  It cited the two reasons given by Williams—that Mrs. Jennings was not sympathetic to petitioner and that Carla was relatively young when he left home—and the additional reasons that the State suggested but that Williams did not articulate (2 H.R. 416-17).  Petitioner objected that Williams's explanation was not credible because it was inconsistent with his proffering the evidence at trial, and that it is unsound strategy to fail to present any evidence of a capital defendant's disadvantaged background where the witnesses are imperfect (2 H.R. 433-34).

21

The Texas Court of Criminal Appeals held that Williams made a reasonable strategic decision not to present evidence of petitioner's disadvantaged background through his mother, who was not sympathetic to him, or his sister, who was relatively young when he was incarcerated. Jennings, 2008 WL 5049911 at *4-5. The court did not cite any authority for the proposition that the failure to present mitigating evidence of a capital defendant's disadvantaged background can be sound strategy where the witnesses are imperfect.

Testimony regarding a capital defendant's disadvantaged background places him in a more sympathetic light before the jury, and trial counsel has a duty to investigate and present evidence of this nature. Ex parte Gonzales, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006). The failure to present evidence of petitioner's disadvantaged background constituted deficient performance. See Armstrong v. Dugger, 833 F.2d at 1433-34 (poverty, poor living conditions, lack of adequate adult supervision, and irregular school attendance); Middleton v. Dugger, 849 F.2d at 494-95 (abuse and neglect during childhood); Cunningham v. Zant, 928 F.2d at 1017-19 (defendant had minimal education, was impoverished, lost his father when he was five years old, and often lived apart from his mother); Brewer v. Aiken, 935 F.2d at 858 (defendant's mother died when he was 12 years old, his elderly father had little interest in him, and he was shuttled between relatives); Blanco v. Singletary, 943 F.2d at 1505 (impoverished childhood); Correll v. Ryan, 465 F.3d

at 1014 (parental neglect); <u>Anderson v. Sirmons</u>, 476 F.3d at 1143-44 (environment of neglect and abuse).

Williams knew about petitioner's disadvantaged background from interviewing petitioner and his mother; indeed, he proffered testimony about some of it outside the presence of the jury.  He decided not to offer the evidence after the trial court refused to restrict the State's cross-examination of petitioner.  Thus, the issue is whether Williams made a sound strategic decision not to offer evidence of petitioner's disadvantaged background.  Reasonably competent counsel would have offered this evidence—whether through petitioner, Carla, or Mrs. Jennings.

Williams had nothing to lose by offering the evidence through petitioner after the trial court refused to restrict the cross-examination.  Petitioner fully discussed the primary offense in a written confession that was introduced in evidence and read to the jury (35 R.R. 554-68; 36 R.R. 860-63; 39 R.R. SX 19).  The jury also heard a lengthy recorded interview in which petitioner discussed with the police the primary offense and the extraneous aggravated robberies (39 R.R. 131, 143, 146-47, 153-54, 163; 39 R.R. SX 22 A; 1 H.R. 163-193).  It is unlikely that the prosecutor could have asked petitioner any questions on cross-examination that the police did not ask during the recorded interview.  Williams's decision not to call petitioner to testify after the court refused to restrict the cross-examination

was unsound strategy.[17]   Assuming *arguendo* that he had a legitimate, unarticulated reason not to call petitioner, that does not excuse his failure to offer the evidence through Mrs. Jennings or Carla.

Williams asserted in his 2003 affidavit that he did not call Carla because she was relatively young when petitioner left home (1 H.R. 351).  Carla was 11 years old when petitioner went to trade school, 12 when he went to a juvenile facility, and 13 when he first went to prison.  Clearly, she was old enough to perceive the deplorable living conditions and neglect that she discussed in her affidavit. Children that age and younger testify every day in courtrooms across the United States about matters as traumatic as physical and sexual abuse.  No reasonably competent lawyer would fail to call a witness to testify about a capital defendant's disadvantaged background simply because she was 11 to 13 years old when she perceived the events.[18]  Williams's implausible excuse, which he first offered at the State's request in 2003, does not justify his decision.  See Virgil v. Dretke, 446 F.3d 598, 611 (5th Cir. 2006) (trial counsel's "justifications not evident on the record and presented for the first time in response to a petition for a writ of habeas

---

[17] Williams did not assert in the 1996 affidavit that he had any other reason not to call petitioner to testify (1 H.R. 40-43).

[18] Carla was 26 years old at the time of the trial.

corpus by the state have little value").[19]

Finally, Williams asserted in his 2003 affidavit that he did not call Mrs. Jennings because she was not sympathetic to petitioner (1 H.R. 351). That was the best reason to call her, as her attitude toward her son may have been the most powerful mitigating evidence in the trial. Williams could have demonstrated that the only parent and role model that petitioner had was a drug-addicted thief who did not want him because he was conceived as a result of a rape and blamed him for her failure to complete her education. Her lack of sympathy would have dramatically demonstrated the extent of his disadvantaged background. Sound strategy requires counsel to present evidence of a capital defendant's disadvantaged background—even through imperfect witnesses—rather than not present it at all. Accordingly, the decision of the Texas Court of Criminal Appeals that Williams made a sound strategic decision not to present this evidence was contrary to or involved an unreasonable application of Strickland and Wiggins.

### 3.    Counsel argued during summation that he could not quarrel with a death sentence.

Williams virtually admitted defeat at the outset of his summation at the punishment stage (39 R.R. 234):

---

[19] Although Williams did not offer this excuse in either affidavit, the State suggested that he could have decided not to call Carla because she took petitioner to the hospital after he was shot and she received money from the robberies (1 H.R. 223-24). Such testimony, if admitted, would not demonstrate that Carla was complicit in the offenses. Even if it did, that is not a legitimate reason not to present any evidence of petitioner's disadvantaged background.

> God, I kind of feel like I'm—I feel like I ought to just sit down.
> Shoot, you twelve people know what the evidence is.  You've heard
> it.  You've probably already decided what you're going to do with
> Jennings in this case.[20]

Williams perfunctorily argued that the murder was not deliberate (39 R.R. 232-34);

that petitioner was in court because he had confessed (39 R.R. 234-36); that

Chaplain Burrell did not consider him to be "incorrigible" (39 R.R. 237-38); and

that the jury should not assess the death penalty based solely on the facts of the

offense (39 R.R. 238-39).  He concluded his summation (39 R.R. 239-40):

> So, let me ask you for him.  If you can, if you can see some way—
> maybe you can't, folks.  Like I told you before, I can't quarrel with
> that.  Shoot, I'm a citizen here just like all of you.  I live here, I work
> here, I'm raising my children here just like you.  But if you can, I ask
> you to find that mitigation, to answer one of those issues "No."
>
> Aside from that, I thank you, folks.  It's been a pleasure working with
> each and every one of you.

In essence, Williams admitted that he, like the jurors, was a concerned

member of the community and could not quarrel with a death sentence.  Rather

than making a forceful argument in support of a life sentence, as effective

advocacy requires, he expressed resignation and acceptance of a death sentence.

He was hardly functioning as the "counsel" constitutionally guaranteed to a capital

defendant.

Defense counsel performs deficiently where his summation is affirmatively

---

[20] Williams repeatedly referred to petitioner as "Jennings," rather than "Mr. Jennings" or "Robert," demonstrating a lack of empathy and affection for his client.

prejudicial.   See Craig v. State, 847 S.W.2d 434, 435-36 (Tex. App.—El Paso 1993, no pet.) (counsel summarized evidence in manner favorable to State, misquoted testimony in manner unfavorable to defendant, referred to defendant's "bandito friends" in absence of evidence, and argued that punishment verdict would not deter lifestyle of defendant or his friends).   Counsel cannot concede the defendant's guilt during summation where he pleads not guilty.   Wiley v. Sowders, 647 F.2d 642, 649-50 (6th Cir. 1981).   It is just as prejudicial for counsel to concede during summation that death is an appropriate punishment.

The trial court found that Williams's argument constituted "plausible trial strategy" but failed to articulate what that strategy was (2 H.R. 422).   Williams did not offer in either affidavit a strategic basis for this argument; even if he had, it could not be sound.   The Texas Court of Criminal Appeals did not address this allegation of deficient performance.   The trial court's finding of fact was unreasonable in light of the evidence presented and its implied conclusion of law, which the Texas Court of Criminal Appeals adopted *sub silentio*, was contrary to or involved an unreasonable application of Strickland.

## C.    Prejudice

The State presented a compelling case for imposition of the death penalty. Petitioner was placed on juvenile probation at age 14, sent to trade school at age 15, sent to a juvenile facility at age 16, and sent to prison for aggravated robbery at

age 17.   Following his release on parole, he returned to prison for aggravated robbery and burglary of a habitation at age 20.   He was "handled" for several disciplinary violations in prison.   Following his release on parole at age 30, he committed five aggravated robberies and killed a police officer.   A death sentence was inevitable unless one juror was persuaded that something in his background made him less morally culpable for his conduct.   Counsel presented only the testimony of a jail chaplain who met petitioner after his arrest and felt that he had "changed" and was not "incorrigible."   The court imposed the death penalty based on the jury's answers to the special issues.

Had counsel conducted a constitutionally adequate mitigation investigation, they could have presented compelling evidence in support of a life sentence. Petitioner's mother conceived him as the result of a rape at age 16.   She frequently told him that she could not complete her education because of him and did not want him.   He lived sporadically with various relatives during childhood and had no positive, lasting male influence.   He and Carla lived in an apartment, supervised by an older cousin, during the week; their mother used drugs when she came home on the weekends.   He lived in poverty and had only the bare essentials.   He received little adult supervision or love.   He did poorly in special education classes, dropped out of school in the ninth grade, and began to use drugs, which led to his criminal conduct.   Although his disadvantaged background does not excuse his

conduct, it diminishes his moral culpability and arguably justifies a life sentence.

Had counsel investigated petitioner's mental condition, they would have discovered Dr. Bloom's report that petitioner demonstrated mild mental retardation and organic brain dysfunction in 1978. They would have requested a psychological evaluation, which inevitably would have led to a QEEG and SPECT-Scan that would have disclosed that he sustained an injury that resulted in organic brain dysfunction. They would have learned that he twice received head injuries that required treatment at a hospital. A psychologist would have testified that he suffers from periods in which impulsive action overcomes his capacity for reason and foresightful action; his capacity for emotional control and self-inhibition is less than that of an unimpaired person; and his condition has a demonstrable physical basis. Counsel could have argued that his mental impairment and disadvantaged background made him less morally culpable for his conduct and constituted reasons to spare his life. Had one juror agreed and persisted in a negative answer to a special issue, petitioner would have received a life sentence.

Counsel's failure to present mitigating evidence of a capital defendant's mental impairment and disadvantaged background results in Strickland prejudice. Armstrong v. Dugger, 833 F.2d at 1434. Evidence of this nature is significant because it provides counsel with a basis to argue that the defendant is less morally

culpable for his conduct than a person without such mitigating evidence.  <u>Lockett</u> <u>v. Anderson</u>, 230 F.3d at 714.

Although mitigating evidence may not overcome a finding of future dangerousness, it may influence the jury's appraisal of the defendant's moral culpability.  "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case."  <u>Williams v. Taylor</u>, 529 U.S. at 398.  In <u>Wiggins</u>, the Supreme Court found prejudice because the defendant's troubled history was relevant to his moral culpability.  <u>Wiggins v. Smith</u>, 539 U.S. at 535.  Had the jury heard this evidence, there was a reasonable probability that at least one juror would have voted against the death penalty, resulting in a life sentence.  <u>Id</u>. at 537.

In <u>Rompilla v. Beard</u>, counsel failed to review the district clerk's file on a prior conviction, which contained information regarding the defendant's mental impairment and disadvantaged background.  The Supreme Court observed that this information would have led competent counsel to request additional testing, and that testing during the habeas proceeding revealed evidence of organic brain damage that severely impaired some of the defendant's cognitive functions.  The Court reversed the death sentence because the undiscovered evidence might have influenced the jury's appraisal of the defendant's moral culpability.  "This evidence adds up to a mitigation case that bears no relation to the few naked pleas

for mercy actually put before the jury, and although . . . it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." <u>Rompilla v. Beard</u>, 545 U.S. at 393.[21]

The Texas Court of Criminal Appeals held that, "while [petitioner's] trial counsel may well have performed deficiently in these respects, [petitioner] has failed to establish a reasonable probability that, but for these deficiencies, the outcome of his punishment proceeding would have been different." <u>Ex parte Jennings</u>, 2008 WL 5049911 at *2. Even had petitioner presented the evidence of brain damage, "there is no reasonable probability that the jury would have relied upon it to recommend a sentence less than death." *Id*. at *5. The court framed the issue as "whether there is a reasonable probability that [petitioner's] jury would have answered any of the statutory special issues, or would have answered a properly formulated <u>Penry</u> instruction, in such a way that [petitioner] would have received a life sentence instead of the death penalty." *Id*. at *6. Although the jury could have decided that brain damage constituted a basis for a sentence less than death, "brain damage would constitute practically the *only* circumstance to be entered on the side of life; there is precious little other evidence of mitigating value to counteract the substantial, non-statutory aggravating circumstances in this case."

---

[21] Based on this language in <u>Rompilla</u>, the trial court's acceptance of Dr. Scarano's opinion over those of the doctors who evaluated and tested petitioner is irrelevant, as one juror could have concluded to the contrary.

*Id.* at \*7.  Thus, there was no reasonable probability that the jury would have considered the jail chaplain's testimony and the evidence of brain damage to be sufficiently mitigating to warrant a life sentence.  *Id.*

The standard of review used by the Texas Court of Criminal Appeals to determine prejudice conflicts with well-settled Supreme Court precedent.   To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Strickland v. Washington</u>, 466 U.S. at 694.  A capital defendant must show that his death sentence is not worthy of confidence; he need not show that he would have received a life sentence.  Texas law provided in 1989 that, if the jurors did not agree on affirmative answers to the special issues, the court had to impose a life sentence.  TEX. CODE CRIM. PROC. art. 37.071(e) (West 1988).   Thus, prejudice is established in a capital case if there is a reasonable probability that one juror would have persisted in a negative answer to a special issue based on the mitigating evidence.   <u>Wiggins v. Smith</u>, 539 U.S. at 537 ("Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions.  Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").

The Texas Court of Criminal Appeals cited no authority to support its extraordinary conclusion that evidence of brain damage, by itself, cannot be sufficiently mitigating to cause one juror to persist in a negative answer to a special issue in a capital case. It further erred in failing to consider two important factors relevant to the prejudice analysis. The first was counsel's failure to present evidence of petitioner's disadvantaged background.[22] The second was that the jury received a nullification instruction that the Supreme Court subsequently held was unconstitutional.

The Supreme Court decided Penry v. Lynaugh, 492 U.S. 302 (1989) (Penry I), on June 26, 1989. Petitioner's jury swore to render a true verdict "according to the law and evidence on July 5, 1989 (33 R.R. 4). The trial court submitted a nullification instruction in the punishment charge (C.R. 478). The State argued during summation, with regard to the nullification instruction, that the jurors promised during the voir dire examination to base their verdict on the law and the evidence and they were obligated to do "nothing less" (39 R.R. 218-20, 227). The Supreme Court subsequently held that the nullification instruction was an unconstitutional response to Penry I. See Penry v. Johnson, 532 U.S. 782 (2001). Had counsel introduced mitigating evidence of petitioner's mental impairment and

---

[22] The Texas Court of Criminal Appeals also failed to consider that, instead of imploring the jury during summation to spare petitioner's life, Williams laconically acknowledged that, as a fellow member of the community, he could not quarrel with a death sentence.

disadvantaged background, and thereafter objected to the nullification instruction, an appellate court would have reversed the death sentence pursuant to Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007); Brewer v. Quarterman, 550 U.S. 286 (2007); and Smith v. Texas, 550 U.S. 297 (2007).

The decision of the Texas Court of Criminal Appeals that petitioner did not demonstrate prejudice, if upheld, will result in his execution without a jury having considered any of the mitigating evidence.   For a federal court to uphold this decision, it must conclude that no reasonable juror who heard the mitigating evidence would have persisted in a negative answer to a special issue.   "Allowing the death penalty to be imposed in that context would fall far short of the constitutional mark."   Deutscher v. Whitley, 884 F.2d at 1161.   Where the jury does not hear mitigating evidence, a court's confidence in a death sentence is undermined; the "gruesome nature of the killing did not necessarily mean that the death penalty was unavoidable."   Douglas v. Woodford, 316 F.3d at 1091.   A court cannot conclude "with any degree of confidence that an objectively reasonable juror, confronted with this mitigating evidence," might not have voted against a death sentence.   Lockett v. Anderson, 230 F.3d at 716; see also Anderson v. Sirmons, 476 F.3d at 1146-48 (although defendant committed three murders, there is a reasonable probability that at least one juror would have voted against a death sentence had counsel presented evidence of his mental impairment and

disadvantaged background).

The DeGarmo case provides an excellent example of prejudice in this context.  DeGarmo kidnapped a young woman, locked her in the trunk of his car, and shot her in the head.  After he was convicted of capital murder, he testified at the punishment stage that he would kill or have someone kill each juror or members of their families if he were not sentenced to death.   The jury accommodated his request.  A federal court ordered a new trial.  The evidence was overwhelming that he acted deliberately, and his prior testimony provided all the evidence of future dangerousness that a jury would ever need.  Undaunted by the challenge, his lawyers obtained a psychological evaluation and testing that demonstrated that he suffers from temporal lobe and frontal lobe dysfunction. They presented that evidence at the punishment stage of the retrial, and he received a life sentence.  Had petitioner's counsel conducted a constitutionally adequate mitigation investigation and presented the evidence developed in the state habeas proceeding, there is a reasonable probability that at least one juror would have persisted in a negative answer to a special issue, resulting in a life sentence.

The adversarial process wholly broke down at the punishment stage of petitioner's trial.  Counsel failed to discover and present the only evidence that might have caused a juror to persist in a negative answer to a special issue.  A death sentence imposed under these circumstances is not worthy of confidence.

The decision of the Texas Court of Criminal Appeals that petitioner did not demonstrate prejudice is contrary to or involved an unreasonable application of <u>Strickland</u>, <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u>.

## <u>CONCLUSION</u>

The Court should grant habeas corpus relief and order a new trial on punishment in state court.

Respectfully submitted,

/S/ Randy Schaffer
Randy Schaffer
State Bar No. 17724500
Federal ID No. 950

The Schaffer Firm
1301 McKinney, Suite 3100
Houston, Texas 770100
(713) 951-9555
(713) 951-9854 (facsimile)
noguilt@swbell.net

Attorney for Petitioner
ROBERT MITCHELL JENNINGS

## **VERIFICATION**

STATE OF TEXAS         §
                                  §
COUNTY OF HARRIS    §

BEFORE ME, the undersigned authority, on this day personally appeared Randy Schaffer, who, after being sworn by me, states that he is counsel for petitioner, that he has read the petition for a writ of habeas corpus, and that the facts contained herein are true and correct.

/S/ Randy Schaffer
Randy Schaffer

SUBSCRIBED AND SWORN TO before me on January 27, 2009.

/s/ Amanda Burleson
Notary Public in and for the
State of Texas
Commission Expires:
October 6, 2011

37