# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2013

Lyle W. Cayce
Clerk

No. 12-70018

United States Courts
Southern District of Texas
FILED

SEP 1 0 2013

David J. Bradley, Clerk of Court

ROBERT MITCHELL JENNINGS,

Petitioner-Appellee

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-219

Before STEWART, Chief Judge, SOUTHWICK and HAYNES, Circuit Judges.

PER CURIAM:[*]

In 1989, Robert Mitchell Jennings was convicted of capital murder and sentenced to death. His conviction and sentence were affirmed on direct appeal, and his state habeas application was denied. In 2009, Jennings filed a federal habeas petition, alleging that his attorneys were ineffective for failing to present evidence of his disadvantaged background and for failing to find and present evidence of his mental impairment. The district court agreed and granted

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-70018

habeas relief.  The Director of the Texas Department of Criminal Justice filed a timely notice of appeal.  We REVERSE and RENDER.

## FACTS AND PROCEDURAL HISTORY

On July 19, 1988, Jennings shot and killed Elston Howard, an officer with the Houston Police Department.  Officer Howard was in the process of arresting the clerk of an adult bookstore when Jennings entered the store, intending to commit a robbery.  Jennings shot Officer Howard four times in the back and head and then robbed the store clerk.

A jury convicted Jennings of capital murder.  During the punishment phase, the State of Texas presented evidence of Jennings' lengthy criminal history.  At the age of fourteen, Jennings was declared a delinquent and placed on probation.  At seventeen, he was convicted of aggravated robbery and sentenced to five years' imprisonment.  At twenty, he was convicted of two more aggravated robberies and a burglary and sentenced to concurrent thirty-year sentences.  Within two months of his release, he committed six more aggravated robberies, including the one that resulted in Officer Howard's death.

George Burrell, the jail chaplain, was the only defense witness called during the punishment phase.  Burrell testified that he met Jennings in the county jail shortly after Jennings' arrest for Officer Howard's murder.  Burrell saw Jennings two to three times a week, and he testified that he did not believe Jennings was "incorrigible."  No other mitigation evidence was presented.

In 1996, Jennings filed a state habeas application, alleging he received ineffective assistance of counsel at the punishment phase.  Specifically, he claimed that his attorneys were ineffective for failing to call his mother and sister to testify regarding his disadvantaged background and for failing to find and present a 1978 psychological report, which suggested that Jennings had "mild organic brain dysfunction" and was mildly mentally retarded.

2

No. 12-70018

The state court found that Jennings' attorneys had performed a sufficient investigation into Jennings' background. As part of that investigation, counsel interviewed Flora and Carla Jennings, his mother and sister, respectively. Connie Williams, one of Jennings' attorneys, submitted an affidavit explaining that he decided not to call Jennings' mother because he perceived her as "not very sympathetic" to Jennings. He reached the same conclusion with respect to Jennings' sister Carla. One of the attorney's concerns was that Jennings had been in and out of prison for most of his sister's life. The state court concluded that counsel's decision not to present testimony from either Flora or Carla Jennings was reasonable trial strategy.

The state court also found that Jennings had failed to show he was mentally retarded or suffered from organic brain dysfunction. The state court considered the 1978 psychological report completed by Dr. J.M. Bloom (the "Bloom Report").[1] In his report, Dr. Bloom suggested that Jennings was mildly retarded and suffered from organic brain dysfunction. The court noted that Dr. Bloom believed Jennings was malingering.

The state court also considered the reports from the more recent psychological evaluations performed on Jennings in connection with the state habeas proceedings. In 1996, a quantitative electroencephalography ("QEEG") test was performed on Jennings. The QEEG revealed "dysfunction in the frontal and temporal areas of the applicant's brain." A single photon emissions tomography ("SPECT") study was also performed, and it revealed "the presence of frontal and left temporal lobe impairment." The SPECT and QEEG results were then evaluated by a psychologist, who concluded that Jennings' "capacity for emotional control and self-inhibition" was impaired.

---

[1] The report, completed ten years before Officer Howard's murder, was prepared as part of a competency evaluation Jennings had been ordered to undergo in connection with the prosecution of aggravated robbery and burglary charges.

3

No. 12-70018

The state court found that the conclusions reached based on the SPECT and QEEG results were unpersuasive given the contrary evidence that Jennings was smart and did not suffer from any mental defects. A 1978 pre-sentence investigation report revealed that Jennings had obtained his G.E.D. and had completed over forty hours of college credit while incarcerated. A 1989 psychological evaluation performed by the Texas Department of Corrections ("TDC") indicated that Jennings had no history of mental health problems and voiced no psychological complaints. A TDC social summary report reflected that Jennings had obtained a barber's license and a butcher's certificate while incarcerated. Accordingly, the state court recommended that the Texas Court of Criminal Appeals deny Jennings' request for habeas relief. The Court of Criminal Appeals accepted the recommendation and denied relief.

In 2009, Jennings filed a petition under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Texas. The district court granted the petition, finding that Jennings had received ineffective assistance of counsel. Specifically, the court found that counsel was ineffective for failing to present testimony regarding Jennings' disadvantaged background and for failing to uncover the Bloom Report and perform a subsequent investigation into Jennings' mental health.

The court acknowledged the "legitimate risks" associated with calling Jennings or his mother to testify regarding his background, then concluded that counsel's decision not to call them was reasonable trial strategy. The court found that the decision not to call his sister Carla "made no sense." The court reasoned that while she may not have had a close relationship with Jennings, she still could have testified regarding the difficult circumstances of their home life. The court explained that while each individual decision not to call a specific witness may have made sense in isolation, the failure to present *any* evidence of Jennings' disadvantaged background was not reasonable trial strategy.

4

No. 12-70018

The district court also found that Jennings' counsel was deficient for failing to uncover the Bloom Report. The court acknowledged Dr. Bloom's concern that Jennings was malingering; even so, the court noted that Dr. Bloom concluded that Jennings suffered from mild mental retardation and organic brain dysfunction. The court held that counsel was deficient for failing to adequately investigate and uncover evidence of Jennings' mental impairment.

Finally, the district court found that counsel's failure to investigate, develop, and present mitigation evidence prejudiced Jennings. The court concluded that evidence of Jennings' disadvantaged background and his mental impairments "might have been sufficient to convince at least one juror that Jennings did not deserve the death sentence."

## DISCUSSION

This case is governed by the Antiterrorism and Effective Death Penalty Act. Under AEDPA, a federal court may not grant habeas relief after an adjudication on the merits in a state court proceeding unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Moreover, a state court's factual findings are presumed to be correct unless the applicant rebuts the presumption by clear and convincing evidence. 8 U.S.C. § 2254(e)(1).

When reviewing a district court's grant of habeas relief, issues of law are reviewed *de novo* and factual findings are reviewed for clear error. *Woodfox v. Cain*, 609 F.3d 774, 788-89 (5th Cir. 2010). "A claim of ineffective assistance of counsel presents a mixed question of law and fact. If the district court's findings of fact are not clearly erroneous, we will independently apply the law to the facts as found by the district court." *Id.* (citation omitted).

5

No. 12-70018

All of Jennings' habeas claims relate to the issue of whether he received ineffective assistance of counsel at the punishment phase. To succeed in this claim, Jennings must demonstrate that his attorneys performed deficiently and that such performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance exists when an attorney's conduct falls "below an objective standard of reasonableness." *Id.* at 688. An attorney's effective assistance at least includes conducting a "reasonably substantial investigation" into potential defenses. *Id.* at 680. Nonetheless, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).

Demonstrating prejudice requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The *Strickland* standard does not require the petitioner to show it was more likely than not that the outcome would have been different. *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002). Instead, "[u]ndermining confidence in the outcome is exactly *Strickland*'s description of what is meant by the reasonable probability standard." *Id.* at 23 (quotation marks omitted). Further, although "[j]udicial scrutiny of counsel's performance must be highly deferential . . . , strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 689-91.

6

No. 12-70018

At the time of Jennings' trial, Texas law provided that a death sentence could not be imposed unless the jurors unanimously answered three special issues in the affirmative; it permitted jurors to answer the special issues in the negative only if "10 or more jurors agree." TEX. CODE CRIM. PROC. ANN. art. 37.071(d)-(e) (West 1985). Therefore, Jennings can show he would not have been sentenced to death by this panel of jurors if he can establish a "reasonable probability" that one juror would have persisted in a negative answer to one of the special issues based on evidence that his attorneys did not discover or present. Importantly, AEDPA deference requires that Jennings establish that all reasonable jurists would agree that he was prejudiced, which means that no reasonable person could adopt the state habeas court's position that no prejudice occurred. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

A. Mental Impairment

Jennings argues that his attorneys' failure to discover the Bloom Report and perform a subsequent investigation into his mental health constitutes deficient performance and that the state habeas court's conclusion to the contrary is unreasonable.[2]

In his affidavit, Williams admitted that he had failed to review the case files from Jennings' prior convictions, which contained the Bloom Report. He further stated that if he had known about the report, he would have "requested

---

[2] Jennings also urges that this court need not defer to the state habeas court's findings because the Texas Court of Criminal Appeals did not adopt the factual findings of the state district court concerning this issue. The case on which Jennings relies for this proposition, *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), was abrogated by the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). *McCamey v. Epps*, 658 F.3d 491, 497 n.1 (5th Cir. 2011). Further, although it declined to decide the deficient-performance element for the mental-impairment issue, the Court of Criminal Appeals did not disturb the state district court's finding that Jennings' attorneys were not deficient in this regard. *See Ex parte Jennings*, Nos. AP-75806, AP-75807, 2008 WL 5049911, at *2 (Tex. Crim. App. Nov. 26, 2008). Because this issue has been decided by the state habeas court, it must be given deference. *See Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010).

7

No. 12-70018

further psychological evaluation." The Director acknowledges these statements but contends that regardless of what Jennings' attorney did or not did not review, every document in existence at the time of trial showed that Jennings was intelligent and did not suffer from any mental impairment. Stated another way, Jennings has failed to show prejudice under *Strickland*. We agree.

Dr. Bloom stated that his evaluation of Jennings revealed a low IQ and mild organic brain dysfunction, but he also concluded that Jennings was malingering. The relevant portion of the Bloom Report reads:

> Although the results of psychological assessment techniques suggest[] the presence of mild mental[] retardation and mild organic brain dysfunction, it is [my] opinion that these are not severe enough to produce the kind of deficits which Mr. Jennings manifested during [the] interview. It is felt that he is attempting to present himself as a mentally ill person in order to delay proceedings.

The Bloom Report's statement that these conditions were enhanced by Jennings' malingering does not necessarily excuse his attorneys' failure to perform a mental-health investigation. Indeed, the Texas Court of Criminal Appeals noted that Jennings' attorneys "may well have performed deficiently" by not conducting a mental-health investigation based on the Bloom Report. It explained that "[e]ven if Dr. Bloom himself attributed the applicant's test results to malingering, it is arguable that his report should nevertheless have sufficed to alert competent trial counsel that further psychological evaluation would be appropriate." In the end, the court did not decide this issue because it determined that even if Jennings' attorneys performed deficiently, their failure to perform a mental-health investigation did not prejudice Jennings.

The district court disagreed. It held counsel to be deficient for failing to uncover the Bloom Report and investigate Jennings' mental health. The district court relied on *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, the Supreme Court held that the defendant's attorneys performed deficiently when

No. 12-70018

"[t]hey failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395. Attorneys deficiently performed when they failed to uncover or introduce a "voluminous amount" of available evidence, including that the defendant was "borderline mentally retarded." *Id.* at 396.

The Supreme Court has also explained that a defendant's attorney "has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. Investigation is essential to fulfillment of these functions." *Wiggins*, 539 U.S. at 524-25 (quoting 1 ABA Standards for Criminal Justice 4-4.1, cmt., p. 4-55 (2d ed. 1982)). The *Wiggins* Court went on to conclude that the representation provided by Wiggins' attorneys fell below the *Strickland* standard when they failed "to expand their investigation beyond the [presentence investigation report] and the [Department of Social Services records]." *Id.* at 524.

Jennings' attorneys admit that "fail[ing] to investigate Mr. Jennings' mental status or present evidence of his mental impairment was not strategic; rather, it was a consequence of our lack of knowledge of any diagnosed mental impairment." The district court considered the similarities between Jennings' case and *Williams* "too strong to ignore." One distinction we see is that there was significantly more mitigation evidence available in *Williams* than here. For example, in addition to the evidence that Williams was "borderline mentally retarded," his attorneys failed to uncover and present evidence that Williams had only achieved a sixth-grade education and had received commendations for helping end a prison drug ring and for returning a prison guard's wallet. *Williams*, 529 U.S. at 396. Further, prison guards would have testified that Williams was the least likely among the inmates to act violently, and a certified

No. 12-70018

public accountant would have testified based on his interactions with Williams during a prison ministry program that he was "thriv[ing] in a more regimented and structured environment." *Id.* We have already summarized the evidence discoverable as to Jennings, and it is not of that magnitude.

Jennings also argues that in light of the evidence that could have been presented supporting a mental deficiency, the Texas Court of Criminal Appeals unreasonably concluded that his attorneys' errors did not prejudice him. Specifically, he points to the results of the additional psychological evaluations performed as part of the state habeas proceedings. Following the discovery of the Bloom Report by Jennings' state habeas attorney, Jennings' mental condition was evaluated by at least three doctors. Dr. Meyer Poler performed a QEEG test on Jennings. According to Dr. Poler's report, Jennings' QEEG results were consistent with "affective disorder and/or learning disability" and suggested that Jennings might benefit from treatment with antidepressants. The test also suggested that Jennings suffered from post-concussive syndrome – a mild form of traumatic brain injury.

A SPECT study was also performed on Jennings. Dr. Theodore Simon reviewed the results. In his report, Dr. Simon explained that the results of the SPECT test revealed abnormalities in certain parts of Jennings' brain that "support the contention" that Jennings had suffered from a brain injury. The results of the QEEG and the SPECT test were reviewed by Dr. Windel Dickerson. In his report, Dr. Dickerson concluded that Jennings was not mentally retarded. Dr. Dickerson nevertheless concluded that the QEEG and SPECT tests confirmed that "Mr. Jennings suffers from periods in which impulsive action overcomes the capacity for reason and foresightful action." Dr. Dickerson further explained that "Mr. Jennings' capacity for emotional control and self-inhibition is less than that of an unimpaired person and his condition has a demonstrable physical basis."

10

No. 12-70018

The Director responds to these reports by admitting that Jennings "may have a learning disability, may benefit from antidepressants, and may have a brain injury of unspecified type and severity." The Director nonetheless contends that the presentation of the Bloom Report and the findings of a subsequent investigation would not have served Jennings' interests because they would have led the State to present evidence that Jennings is mentally sound. For instance, the State could have presented the report of Dr. John Nottingham, who performed an independent psychiatric examination of Jennings the day after Dr. Bloom. In his report, Dr. Nottingham explained that his findings "are consistent with a person who is attempting to appear to be mentally disturbed on a voluntary basis." He concluded that "[t]here does not appear to be a disease of the mind or mental defect which would interfere with [Jennings'] ability to consult with his attorney."

Also, prior to Jennings' capital trial in 1989, the court ordered Dr. Jerome Brown to perform a competency evaluation. Dr. Brown concluded that "[n]one of the information that is available at present suggests that [Jennings] was suffering from any severe mental illness or mental defect at the time the alleged offense took place" and that he was of sound mind at the time of the crime. Moreover, the State hired Dr. Victor Scarano during the state habeas proceedings to offer his opinion of Jennings based on evidence that had been collected by other doctors. Dr. Scarano did not examine Jennings; instead, his conclusions were based on his review of the psychological reports mentioned above along with other documents bearing on Jennings' mental status. Dr. Scarano concluded that Jennings "was malingering a mental disease or disorder" during his interactions with Drs. Bloom and Nottingham. Dr. Scarano also concluded that Jennings "was not mentally retarded or suffering from an organic brain dysfunction" at the time of the primary crime, which the report found "was not an impulsive act but a controlled and deliberate act."

11

No. 12-70018

Dr. Scarano also criticized Dr. Dickerson's reliance on the QEEG and SPECT tests.  With respect to the QEEG test, Dr. Scarano noted that "[a] specific clinical advantage has yet to be unequivocally demonstrated for any of the quantitative EEG or mapping techniques."  He explained that "a QEEG is insufficient to diagnose brain damage, but may be confirmatory of a diagnosis of brain damage."  Dr. Scarano also pointed to several deficiencies in the SPECT test, which Dr. Simon had emphasized in his report.  For example, Dr. Simon noted that "[n]o information was available regarding the binding or age on the tracer used in this examination" – a significant limitation given that the tracer molecule used in the test is "highly unstable" and "should be injected within fifteen minutes of preparation."  Dr. Simon also noted that the "banded color table . . . used for imaging the data" was not provided to him.  Dr. Scarano found it problematic that despite stating he lacked important information bearing on the reliability of the study, Dr. Simon nonetheless concluded Jennings had suffered a brain injury.

In addition to these reports, the Director urges that there was ample evidence that Jennings did not suffer from any mental infirmity.  Specifically, he points to Jennings' scholastic achievements while incarcerated, his professional certifications, and his score of 105 on an IQ test.  The Director contends that this evidence further demonstrates that Jennings was not prejudiced by his attorneys' failure to investigate his mental condition.

Based on the above, Jennings has failed to establish prejudice.  At best, Jennings relies on the opinions of dueling experts who would have provided conflicting evidence concerning his mental capacity.  This is insufficient to meet the burden under AEDPA's deferential standard, which requires Jennings to show that no reasonable jurist would have reached the same conclusion as the state habeas court.  The Court of Criminal Appeals did not reach an

12

No. 12-70018

unreasonable conclusion regarding the lack of prejudice, and under AEDPA its decision should stand.

B.  Disadvantaged Background

Jennings also argues that his attorneys provided ineffective assistance by failing to present the mitigation testimony of himself, his mother, or his sister. The Texas Court of Criminal Appeals rejected Jennings' claim on all three points.   The district court held that the state court's conclusion was unreasonable to the extent that it found that the failure to call Jennings' sister did not result in ineffective assistance.  The Director contends that the decision to call a prison chaplain, whose testimony presented fewer risks than the testimony of Jennings or his family members, was a fully informed strategic decision and did not amount to ineffective assistance.

In evaluating whether Jennings' attorneys were deficient, this court is "required not simply to give [Jennings'] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [Jennings'] counsel may have had for" not presenting the testimony of these three individuals. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (citation and quotation marks omitted).  Indeed, an attorney may decline to present evidence of a defendant's background during the penalty phase and instead focus on "convinc[ing] the jury that [the defendant] would not be a future danger in prison." *Perkins v. Quarterman*, 254 F. App'x 366, 371 (5th Cir. 2007) (unpublished); *see also Brown v. Thaler*, 684 F.3d 482, 498-99 (5th Cir. 2012).

The Texas Court of Criminal Appeals credited several reasons that would justify not calling Jennings, his mother, or his sister.  For instance, Williams stated in his affidavit that he did not ask Flora Jennings to testify because he determined after interviewing her that she "was not very sympathetic to Jennings." Similar to the problem posed by calling Flora Jennings, Williams did not believe that Carla Jennings would be a sympathetic witness.  In addition,

13

No. 12-70018

Williams suggested in his affidavit that Carla Jennings would not be a beneficial witness because she was several years younger than Jennings and had little interaction with him given that he had been in and out of juvenile detention and prison for most of her life. Thus, she had limited knowledge of Jennings' upbringing. There were also legitimate risks associated with calling the defendant Jennings given that his attorneys were unable to persuade the trial court to allow him to testify about his background without being subjected to full cross-examination.

The district court concluded it was reasonable for counsel not to call either Jennings himself or his mother as witnesses. With respect to the sister Carla Jennings, though, the court complained that the "explanation for not calling Jennings' sister makes no sense." In the district court's view, the fact that Carla Jennings did not have a close relationship with her brother had no bearing on her ability to testify about the conditions at home.

Although Carla Jennings may have been the best available option to present evidence concerning Jennings' background, we conclude there was no AEDPA-recognizable error when the state court determined that his attorneys reasonably could have decided that the risks associated with her unsympathetic testimony outweighed any benefits. True, omitting her testimony meant jurors heard no evidence regarding Jennings' disadvantaged background. A capital defendant's disadvantaged background, though, can be a "double-edged" sword that "might permit an inference that he is not as morally culpable for his behavior, [but] also might suggest [that he], as a product of his environment, is likely to continue to be dangerous in the future." *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *see also Brown*, 684 F.3d at 499. Jennings' attorneys could reasonably have concluded that resources were better spent focusing the jury's attention on Jennings' lack of future dangerousness rather than attempting to garner support for Jennings based on his troubled background. As such, it was

14

No. 12-70018

not unreasonable for the Texas Court of Criminal Appeals to conclude that Jennings' attorneys were not deficient with respect to their strategic decision to omit evidence of Jennings' background.

C. *Penry* Claim

Because we have determined that the state habeas court's conclusion that Jennings' attorneys were not deficient with respect to the omission of evidence on Jennings' background is reasonable, we need not consider whether counsel's decision prejudiced Jennings. Nonetheless, we address Jennings' argument that he suffered prejudice because "had counsel introduced mitigating evidence of [his] mental impairment and disadvantaged background," any death sentence he received would have been reversed based on the nullification instruction the jury received in violation of *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), as interpreted by *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*).

*Penry* requires that jurors be provided the opportunity to "fully consider[] the mitigating evidence as it [bears] on the broader question of [the defendant's] moral culpability." *Penry II*, 532 U.S. at 787. "[I]t is only when the jury is given a vehicle for expressing its reasoned moral response to [mitigating] evidence in rendering its sentencing decision . . . that [the court] can be sure that the jury has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Id.* at 797 (citation and quotation marks omitted) (finding a nullification instruction unconstitutional because a "reasonable juror could well have believed that there was no vehicle for expressing the view that [the defendant] did not deserve to be sentenced to death based upon his mitigating evidence" (quoting *Penry I*, 492 U.S. at 326)). Indeed, the "statutory special issues presented to the jury at sentencing and the prosecutor's closing arguments regarding those special issues" must allow the jury to give "meaningful consideration and effect to all of

No. 12-70018

[the defendant's] mitigating evidence." *Pierce v. Thaler*, 604 F.3d 197, 201 (5th Cir. 2010).

This special instruction requirement was first announced by the Supreme Court on June 26, 1989, in *Penry I*. 492 U.S. at 328. The guilt phase of Jennings' trial followed shortly thereafter on July 5, 1989. In light of *Penry I*, the court gave Jennings' jury the following nullification instruction:

> When you deliberate about the questions posed in the Special Issues, you are to consider mitigating circumstances and factors, if any, supported by the evidence presented in both phases of trial. A mitigating circumstance may be any aspect of the Defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find that there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine that, in consideration of this evidence, [] a life sentence rather than a death sentence, is an appropriate response to the personal moral culpability of the Defendant, you are instructed to answer the Special Issue under consideration "No."

Notably, Jennings' attorneys requested this instruction and did not object to it as inadequate. Jennings was sentenced to death, and his conviction became final in 1993. In 2001, the Supreme Court in *Penry II* held that a jury instruction that was substantially similar to the instruction provided to Jennings' jury did not satisfy the Eighth Amendment's mitigation-instruction requirement as established by *Penry I*. *See Penry II*, 532 U.S. at 789-90, 803-04.

Based on the similarity between the instruction Jennings' jury received and the instruction the Supreme Court found inadequate in *Penry II*, Jennings argued in his state habeas proceeding that his Eighth Amendment right to a special instruction had been violated. After noting that Jennings' "*Penry* claim is limited to evidence adduced at his trial, and does not include the jury's ability to render a reasoned moral response to mitigating evidence he now claims *should* have been adduced," the Texas Court of Criminal Appeals determined

16

that based on the "circumstances there is no Eighth Amendment deficiency." Specifically, the court explained that "[t]he only mitigating evidence presented at trial was Chaplain Burrell's testimony with respect to the applicant's behavior and demeanor in the jail." This evidence, the court concluded, had only a "tenuous connection" to Jennings' moral culpability and therefore the special instruction was unnecessary. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 253 n.14 (2007) (explaining that a "special instruction is not required when mitigating evidence has only a tenuous connection . . . to the defendant's moral culpability"). Consequently, the court did not evaluate the sufficiency of the *Penry* instruction on the merits based on its holding that Jennings presented inadequate mitigating evidence to require an instruction.

On appeal, Jennings does not advance a pure-*Penry* argument. Instead, he argues that the failure to offer mitigating evidence of his background deprived him of an argument on appeal that the nullification instruction violated his Eighth and Fourteenth Amendment rights, which could have resulted in overturning his sentence on direct appeal or by a state or federal habeas court.

The district court did not consider Jennings' *Penry*-based prejudice argument because it found that Jennings failed to exhaust this claim in his state habeas proceeding. "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971). A fair opportunity to consider a claim requires that "all the facts necessary to support the federal claim were before the state courts" and "the habeas petitioner must have fairly presented to the state courts the substance of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (quotation marks omitted).

Although Jennings established the factual basis to support his *Penry*-based prejudice argument, he did not provide the Texas Court of Criminal

17

No. 12-70018

Appeals with a fair opportunity to consider the substance of his argument – he inserted it in a footnote at the end of his brief. *See Bridas SAPIC v. Gov't of Turkm.*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) (holding that an argument raised only in a footnote of a brief is waived). Specifically, Jennings argued that:

> Had applicant's counsel introduced mitigating evidence of his mental impairment and disadvantaged background, and thereafter objected to the nullification instruction, this Court would be obligated to reverse the death sentence pursuant to *Abdul-Kabir v. Quarterman*, 550 U.S. [233] (2007); *Smith v. Texas*, 550 U.S. [297] (2007); and *Brewer v. Quarterman*, 550 U.S. [286] (2007). However, the jury could consider and give effect to applicant's mitigating evidence of good behavior while confined in jail in answering the future dangerousness special issue. *See Franklin v. Lynaugh*, 487 U.S. 164 (1988). Thus, the nullification instruction was superfluous under controlling Supreme Court precedent because counsel did not present and, thus, the jury was not called upon to consider and give effect to the mitigating evidence of applicant's mental impairment and disadvantaged background. In short, *Penry II* is not applicable.

This argument only vaguely alerted the state habeas court to his *Penry*-based prejudice argument and focused instead on arguing that *Penry II* is not applicable. This passing reference to his *Penry*-based prejudice argument during his state habeas proceedings does not suffice to exhaust his claim. As a result, Jennings is barred from asserting this claim in his federal habeas petition.

Because this claim is unexhausted and procedurally defaulted, Jennings cannot now rely on it to establish prejudice resulting from the failure to present background and mental-health mitigating evidence during the penalty phase. *See* 28 U.S.C. § 2254(b)(1).

D. Closing Argument

Jennings argues in a "cross-point" that his attorney provided ineffective assistance during his closing argument by conceding defeat and stating that he could not quarrel with the jury's decision to find him eligible for the death penalty. Before turning to the merits of Jennings' argument, this court must

18

No. 12-70018

determine whether his claim is procedurally barred because he did not file a timely notice of appeal and filed a certificate of appealability ("COA") with this court six months after the Director filed his notice of appeal.

A defendant generally must file a notice of appeal of a district court's denial of a federal habeas application within thirty days after the entry of final judgment. *See Bowles v. Russell*, 551 U.S. 205, 207 (2007); *see also* FED. R. APP. P. 4(a)(1)(A). When the opposing side appeals first, the party also seeking to appeal must do so "within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later." FED. R. APP. P. 4(a)(3). Failure to file a notice of appeal deprives this court of jurisdiction to consider the appellant's claims. *See Bowles*, 551 U.S. at 206-07. Here, although the Director filed a timely notice of appeal, giving the court jurisdiction to consider two of Jennings' ineffective-assistance-of-counsel claims, Jennings did not file a notice of appeal concerning the claim the district court decided against his interest – the closing argument claim.

Jennings also failed to seek a COA from the district court first. The district court must first rule on a petitioner's COA request before this court has jurisdiction to consider it. *See Cardenas v. Thaler*, 651 F.3d 442, 443 (5th Cir. 2011). While the State may appeal a grant of habeas relief without seeking a COA, "a state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition" and "must first seek and obtain a COA." *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (*Miller-El I*) (citing 28 U.S.C. § 2253).

When the State appeals a grant of habeas relief, circuit courts of appeal are split on whether a petitioner can raise arguments in opposition to the state's appeal concerning grounds for relief not adopted by the district court without first seeking a COA. For instance, the Seventh Circuit views the COA requirement in 28 U.S.C. § 2253(c) as a gate-keeping function and therefore

No. 12-70018

finds it unnecessary for a petitioner to seek a COA when an appeal is already before the court based on the state's appeal of a grant of habeas relief. *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002). The court held that Section 2253(c) "deals only with *appeals* by prisoners; it does not mention arguments by prisoners as *appellees* offered in support of relief they have obtained." *Id.* In contrast, the Second Circuit has held that "a habeas petitioner to whom the writ has been granted on one or more grounds may not assert, in opposition to an appeal by the state, any ground that the district court has not adopted unless the petitioner obtains a certificate of appealability permitting him to argue that ground." *Grotto v. Herbert*, 316 F.3d 198, 209 (2d Cir. 2003).

This circuit has rejected the idea that a State's appeal displaces Section 2253(c)'s gate-keeping function, and with it the requirement that a petitioner must seek a COA. *See Wiley v. Epps*, 625 F.3d 199, 204 n.2 (5th Cir. 2010). In *Wiley*, the district court granted habeas relief based on the petitioner's claim that he was mentally retarded and ineligible for a death sentence as contemplated by *Atkins v. Virginia*, 536 U.S. 304 (2002). *Id.* at 202. The State appealed the district court's grant of habeas relief. *Id.* This court noted that the district court rejected the petitioner's other arguments in support of relief, but the petitioner had failed to file a notice of appeal or seek a COA as to those arguments. *Id.* at 204 n.2. As a result, the only issue before the court was the petitioner's *Atkins* claim. *Id.*

Jennings does not distinguish *Wiley* or argue in his brief that a notice of cross-appeal or COA is unnecessary to establish jurisdiction. A party seeking to invoke the court's jurisdiction must advance arguments establishing jurisdiction. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983).

Jennings' "cross-point" is DISMISSED and his motion for a COA is DENIED. The judgment granting habeas relief is REVERSED, and judgment is RENDERED, denying habeas relief.

20