1        UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF TEXAS

3          HOUSTON DIVISION

4  ROBERT MITCHELL JENNINGS,              .
                                          .
5              Petitioner,                .
                                          .  Civil Action
6  VS.                                    .  No. H-09-CV-219
                                          .
7  DIRECTOR OF TDCJ CID LORIE DAVIS,      .  Houston, Texas
   ET. AL.,                               .  January 17, 2019
8                                         .  2:13 p.m.
               Respondents.              .
9  . . . . . . . . . . . . . . . . . . .

10              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LYNN N. HUGHES
11                    HEARING

12 APPEARANCES:

13 FOR THE PETITIONER:

14         Mr. Edward A. Mallett
           MALLETT SAPER BERG, LLP
15         4306 Yoakum Boulevard
           Suite 400
16         Houston, Texas 77006
           713.236.1900
17         FAX:  713.228.0321
           edward@mgscounsel.com
18
           Mr. Joshua Freiman
19         Mr. Tivon Schardl
           FEDERAL PUBLIC DEFENDER
20         504 Lavaca Street
           Suite 960
21         Austin, Texas 78701
           512.916.5025
22         FAX:  512.916.5035
           Joshua_Freiman@fd.org
23         Tivon_Schardl@fd.org

24

25         PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

                              APPEARANCES

                              (continued)

FOR THE PETITIONER:

         Mr. Randolph Lee Schaffer, Jr.
         SCHAFFER LAW OFFICES
         1021 Main
         Suite 1440
         Houston, Texas  77002
         713.951.9555
         FAX:  713.951.9854
         noguilt@swbell.net

FOR THE RESPONDENTS:

         Mr. Matthew D. Ottoway
         Mr. Jay D. Clendenin
         Ms. Katherine D. Hayes
         Assistant Attorneys General
         ATTORNEY GENERAL'S OFFICE
         Criminal Appeals Division
         PO Box 12548
         Austin, Texas  78711-2548
         512.936.1400
         FAX:  512.320.8132
               512.936.1280
               512.320.8132
         matthew.ottoway@oag.texas.gov
         katherine.hayes@oag.texas.gov
         jay.clendenin@oag.texas.gov


COURT REPORTER:

         GAYLE L. DYE, CSR, RDR, CRR
         515 Rusk, Room 8004
         Houston, Texas  77002
         713.250.5582

PROCEEDINGS

January 17, 2019

THE COURT:  Mr. Mallett, what do you know now that suggests the likelihood that the punishment would be changed?

02:13:02  MR. MALLETT:  Well, I think there's a very high likelihood.  We are here on a motion to give us the time permitted by statute to complete an investigation; but in that context, I would start by pointing out that Mr. Randy Schaffer's motion suggesting the appointment of conflict-free counsel

02:13:27  recites that he has identified grounds on which he may have been deficient; and he would have to plead his own ineffectiveness.

Those areas were recited in his motion which are the Defendant's intoxication by drugs and alcohol at the time of the offense and his life-long history of abuse, including abuse

02:13:55  of narcotics.  Our investigation has revealed there are witnesses who have never been spoken to.

THE COURT:  Witnesses to what?

MR. MALLETT:  Abuse of Mr. Jennings' in his childhood.

THE COURT:  How old is Mr. Jennings?

02:14:10  MR. MALLETT:  64?

THE COURT:  64?

MR. MALLETT:  65?

Somebody correct me.

THE COURT:  How old was --

02:14:18  MR. MALLETT:  61, I'm told.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  How old was he at the time of the

2    occurrence?

3          MR. MALLETT:  Approximately, 31.

4          THE COURT:  And when did Mr. Jennings quit living at

02:14:37    5    home?

6          MR. MALLETT:  He never had a stable home life.  He was

7    bounced around --

8          THE COURT:  Stable enough to get beat up.

9          MR. MALLETT:  Yes, sir.

02:14:51   10          THE COURT:  At some point, he leaves and doesn't go

11    back to the people who treated him like that.

12          MR. MALLETT:  That's right.  And then, he's in jail

13    and out of jail and in prison and out of prison.  But he lacked

14    any, to my understanding of the record, long-term, stable,

02:15:08   15    nourishing, or healthy environment.  To the contrary, it was the

16    exact opposite.

17          THE COURT:  So, the perpetrator of these abuses varied

18    over time?

19          MR. MALLETT:  That's correct, your Honor.  And we have

02:15:32   20    a description but not a name of a person described as giving

21    intimate abuse to him in his childhood, but we're still

22    investigating that.

23          THE COURT:  Why didn't he tell all his lawyers about

24    that?

02:15:58   25          MR. MALLETT:  I really can't speak for what he told or

didn't tell all his lawyers.  I can speak to what he's told me

because I've been to the Polunsky Unit and spoken to him.  But I

regret to say I can't answer that particular -- that specific

question.

02:16:26   THE COURT:  As usual, you're right, you don't know

everything.  The point badly put indirectly is he knew he had

been abused, he knew by whom he had been abused.  He may not

have known the names, but that's hardly newly discovered.  That

is something that he has possessed the entire time.

02:16:53   MR. MALLETT:  The thrust of the pleadings is

ineffective assistance for failure to conduct an adequate

investigation and develop that evidence.  This Court has

presided over hundreds and hundreds of cases in more than 30

years.

02:17:13   You don't always hear it the same way the first

time or even the second time; and then, a person, an advocate,

has to determine what's credible and what's not credible.  So,

once again, we're here asking for, basically, until February the

17th to complete an investigation; and we realize that's not a

02:17:39   trivial request.  It has ramifications, and the Court will take

that very seriously.

But it is the essence of our motion that we're

not prepared for a merits argument today and cannot be because

we have ongoing investigations even though -- you know, really,

02:17:58   your Honor, when I got this appointment, I didn't know the

1  Defendant's name, nothing about the history of the case.  I

2  started with an empty blackboard.

3         The pleadings in the case that I read over the

4  next three weeks I can just hold in my hand as a visual exhibit,

02:18:20  5  these plus numerous cases; and frankly, I got overwhelmed and

6  still kind of feel overwhelmed.  But after not long, I asked for

7  help; and I appreciate the Court giving me help.

8         We have worked --

9         THE COURT:  Who is the help?

02:18:39  10        MR. MALLETT:  Oh, if I may?

11        THE COURT:  Yes.

12        MR. MALLETT:  I'm joined by Joshua Freiman and Tivon

13  Schardl, Federal Public Defenders, Austin, Texas, Western

14  District of Texas, Capital Habeas Unit, and also Adrian De La

02:18:55  15  Rosa who is an investigator who has been working on the case.

16        THE COURT:  Thank you.

17        MR. MALLETT:  And so, I and then we have worked on

18  holidays, weekends during the holidays.  Of course, yes, I have

19  other cases.  I have a family.  But almost -- almost every day

02:19:13  20  this case has occupied me and, since their appointment, has

21  occupied two and, really, a third lawyer and Mr. De La Rosa to

22  some extent or another.  We have been diligent.

23         The statute provides that on appointment of

24  counsel, the Court may stay a matter for a period of 90 days.

02:19:39  25  I'm trying to persuade the Court to give the Federal Public

1  Defender, Capital Habeas Unit, the 90 days since their

2  appointment to assist me.  That's -- and I know there's

3  consequences; but that's the time we're asking for.  February

4  19, 2019, would be their 90th day.

02:20:20  5           THE COURT:  When was the remand obeyed by the Circuit

6  Court?

7           MR. MALLETT:  My colleague, Mr. Freiman, probably has

8  that date at his fingertips.  I can't remember it.  But what I

9  remember is that the Court of Criminal Appeals, Elsa -- Judge

02:20:46  10 Elsa Alcala dissenting to the Court not reopening on its own

11 motion entered an order; and two days later, Mr. Schaffer filed

12 his motion in this Court.

13               As to when the remand came and was acted on in

14 the previous appeal, I just don't have the date in front of me.

02:21:07  15 I don't want to cite it and be wrong.

16           MR. FREIMAN:  Your Honor, it was on July 7, 2015.

17           THE COURT:  Speak up.

18           MR. FREIMAN:  Excuse me, your Honor.  It was on July

19 7, 2015, that the Fifth Circuit acted on the remand from the

02:21:26  20 Supreme Court and denied the remaining relief that Mr. Schaffer

21 sought.

22           THE COURT:  Three and a half years ago?

23           MR. FREIMAN:  Correct.  And during that time, your

24 Honor, if I may, Mr. Schaffer --

02:21:43  25           THE COURT:  You have to speak up.

1          MR. FREIMAN:  -- Mr. Schaffer had a conflict of

2     interest that prevented him from acting on information that we

3     now have.

4          THE COURT:  Wait a minute.  Prevented?

02:21:58   5          MR. FREIMAN:  Yes, your Honor.

6          THE COURT:  How did it prevent him?

7          MR. FREIMAN:  The conflict of interest that arose from

8     the decisions in <u>Martinez</u> and <u>Trevino</u> put Mr. Schaffer in a

9     position where he was --

02:22:13  10          THE COURT:  I know the hypothetical.

11          MR. FREIMAN:  Yes, your Honor.

12          THE COURT:  So, you have to assume that Schaffer

13    wouldn't do the right thing if he realized after the trial that

14    he should have done something.

02:22:31  15          MR. FREIMAN:  Yes, your Honor.

16          THE COURT:  I'm not going to assume Mr. Schaffer would

17    not have done the right thing.

18          MR. FREIMAN:  And I thank you for your appointment of

19    our office and Mr. Mallett, and we were appointed to investigate

02:22:48  20    those circumstances that might show that there were meaningful

21    ineffective assistance of trial counsel claims that could be

22    raised at this time.

23          THE COURT:  And what are they?

24          MR. FREIMAN:  Your Honor, we have, as Mr. Mallett

02:23:04  25    said, worked diligently to investigate this case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

             1          THE COURT:  Wait.  I don't want a speech.  I want a

             2    list of things, substantive things done wrong.

             3          MR. FREIMAN:  Your Honor, Mr. Schaffer listed two very

             4    substantial areas of ineffectiveness that he admitted in his own

02:23:28     5    conduct.  He said first that --

             6          THE COURT:  What are you investigating if he's

             7    admitted it?

             8          MR. FREIMAN:  Your Honor, our investigation has showed

             9    that a number of witnesses have never been talked to before by

02:23:42    10    any prior counsel and the --

            11          THE COURT:  You're not obliged to talk to everybody

            12    who may be a witness.  We're not talking about witnesses to the

            13    crime.

            14          MR. FREIMAN:  No, sir.

02:23:58    15          THE COURT:  Right?

            16          MR. FREIMAN:  And you're absolutely correct.  We have

            17    triaged our investigation.  It is not a full scale investigation

            18    of every possible witness.  What we have done, your Honor, is

            19    investigate, first, any possible witness who could speak to his

02:24:11    20    drug abuse.  Now, that --

            21          THE COURT:  Wait.  You mean, you don't know that he

            22    used drugs?

            23          MR. FREIMAN:  Your Honor?

            24          THE COURT:  How many times has he gone to jail or

02:24:25    25    prison for drug use or possession?

1          MR. FREIMAN:  His principal crimes have been for

2     robbery and then, of course, capital murder.

3          THE COURT:  Somebody said he was in and out of prison

4     for 30 years.

02:24:41   5          MR. FREIMAN:  Correct, your Honor.

6          THE COURT:  They were all for two?

7          MR. FREIMAN:  I'm sorry?

8          THE COURT:  He has a criminal record.  He has prison

9     medical records.

02:24:51  10          MR. FREIMAN:  Yes, your Honor.  And as you saw, we had

11     difficulty in initially obtaining prison records; and we

12     obtained from Mr. Schaffer's file his prison medical records

13     circa 1996.

14          THE COURT:  Mr. Jennings?

02:25:11  15          MR. FREIMAN:  Mr. Jennings.

16          THE COURT:  Not Mr. Schaffer's.

17          MR. FREIMAN:  Excuse me, your Honor.  Yes, your Honor.

18          THE COURT:  His file is not in the record.

19          MR. FREIMAN:  Yes, your Honor.  Mr. Jennings' file.

02:25:20  20     We found Mr. Jennings' prison records circa 1996.

21          THE COURT:  What did they show?

22          MR. FREIMAN:  They do not speak to the drug abuse

23     because the drug abuse occurred not in the prison.

24          THE COURT:  When he shows up --

02:25:42  25          MR. FREIMAN:  I'm sorry.  Your Honor, what I can tell

1  you --

2         THE COURT:  The idea is that there is this substantial

3  likelihood that the punishment would be incorrect because he

4  used drugs and was abused as a child.

02:26:03  5         MR. FREIMAN:  Yes, your Honor.  Those facts have in

6  the past been sufficient to establish a new -- entitlement to a

7  new penalty phase where counsel didn't investigate those things

8  at trial.

9         THE COURT:  Wait a minute.  Explain to me how abuse as

02:26:21  10  an eight year old justifies murdering somebody 22 years later.

11         MR. FREIMAN:  Your Honor, mitigating evidence does not

12  have to be directly related to the offense itself.  The Supreme

13  Court has instructed in Lockett and Eddings --

14         THE COURT:  They haven't instructed, they have decided

02:26:44  15  a case on those grounds.

16         MR. FREIMAN:  Your Honor, it's a consistent path of

17  the law in Lockett; Eddings; Penry I, II; Smith v. Texas; and

18  onward.

19         THE COURT:  Stick to the facts.

02:26:58  20         MR. FREIMAN:  Yes, sir.

21         THE COURT:  It has nothing to do with the crime.

22         MR. FREIMAN:  It may.  In this instance --

23         THE COURT:  Wait a minute.

24         MR. FREIMAN:  -- we are also investigating --

02:27:08  25         THE COURT:  They say we don't have to show that.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

MR. FREIMAN: I'm sorry. The childhood abuse that you just mentioned, your Honor, is not directly relevant to the crime; and the Supreme Court has said nor does it have to be for it to be independently mitigating.

02:27:23   THE COURT: I'll get to that question. Answer my question. It has nothing to do with the crime?

MR. FREIMAN: I can't say that because, your Honor, as Mr. Schaffer has alleged about his own ineffectiveness in failing to investigate --

02:27:39   THE COURT: Quit repeating stuff.

MR. FREIMAN: Yes, your Honor. Yes, your Honor. I apologize.

THE COURT: Mr. Schaffer is a wonderful lawyer.

MR. FREIMAN: Yes, your Honor. I merely --

02:27:49   THE COURT: I want you to tell me -- you can't raise independent claims at this point.

MR. FREIMAN: Yes.

THE COURT: The only question is whether his representation in two phases was a conflict of interest that

02:28:11   impaired the effectiveness of his -- his first and second appeals or writs, right?

MR. FREIMAN: Yes.

THE COURT: And so far, you're telling me there are people who could have been talked to.

02:28:29   MR. FREIMAN: Yes, your Honor.

1          THE COURT:  But nobody knew he was abused as a child

2    back 30 years ago?

3          MR. FREIMAN:  It is not that no one knew, it is that

4    no counsel spoke to those who did know.

02:28:52   5          THE COURT:  Who knew?

6          MR. FREIMAN:  Family members, including some in the

7    courtroom today.

8          THE COURT:  And his family did not volunteer that

9    information, counsel.

02:29:07  10          MR. FREIMAN:  The record doesn't disclose an answer to

11    that, but what I can say is that they're not --

12          THE COURT:  Mr. Schaffer would know, and they would

13    know.  Have you talked to them?

14          MR. FREIMAN:  I've spoken with Mr. Schaffer.

02:29:18  15          THE COURT:  Have you talked to the family?

16          MR. FREIMAN:  And I've spoken with the family through

17    my investigator.

18          THE COURT:  No.  That's not you talking to them.

19    Investigators are great people.  They happen not to be trial

02:29:29  20    lawyers, and we're grateful for that.  They have enough.  You

21    have not asked the people who were available for the last 31

22    years whether and who and how often and in what way Mr. Jennings

23    was abused.

24          Have you talked to Mr. Jennings about that?

02:29:57  25          MR. FREIMAN:  About --

1          THE COURT:  Have you talked to Mr. Jennings?

2          MR. FREIMAN:  Yes, your Honor.  It's -- the keystone

3   of any good investigation is the information from the client.

4          THE COURT:  No, I didn't ask you that, did I?

02:30:11   5          MR. FREIMAN:  No, your Honor.

6          THE COURT:  I asked you whether you had visited with

7   Mr. Jennings.  Did he talk to you about abuse?

8          MR. FREIMAN:  Yes, your Honor.

9          THE COURT:  And have you confirmed that?

02:30:26  10          MR. FREIMAN:  Confirmed it with other family members,

11  yes.

12          THE COURT:  So, it is clear that everybody knew about

13  the abuse?

14          MR. FREIMAN:  Yes, your Honor.

02:30:42  15          THE COURT:  All right.  Why is it not too late to

16  bring up this claim 30 years later?

17          MR. FREIMAN:  Your Honor, the procedural obstacles to

18  raising this are not insurmountable; but they are steep; and we

19  acknowledge that.  However, we believe that there is a vehicle

02:31:04  20  for this Court to review that evidence.

21               First, we believe that the evidence can be

22  reviewed by this Court through a Rule 60(b) motion that alleges

23  both counsel's failure in respect to the nullification

24  instruction which would have --

02:31:30  25          THE COURT:  Wait.  His failure in connection with

1  what?

2         MR. FREIMAN:  The nullification instruction, your

3  Honor.

4         THE COURT:  What was wrong with that?

02:31:37  5         MR. FREIMAN:  The nullification instruction, as the

6  Supreme Court held, was confusing and didn't permit the jury to

7  give meaningful -- or full effect to any mitigating evidence

8  that would have been presented that couldn't be presented

9  through the special issues which are the statutory factors that

02:32:06  10  all juries in 1989 were required to answer in the affirmative to

11  issue a death sentence.

12         THE COURT:  Mr. Schaffer brought the first habeas

13  corpus that I saw?

14         MR. FREIMAN:  He did, your Honor.

02:32:33  15         THE COURT:  And the one to the Court of Criminal

16  Appeals?

17         MR. FREIMAN:  Yes, your Honor.

18         THE COURT:  So, it's Jennings' position, even if the

19  abuse evidence had been there, the instruction was wrong so they

02:33:15  20  wouldn't have known what to do with it?

21         MR. FREIMAN:  That's correct, your Honor.

22         THE COURT:  And why isn't this a successive petition?

23         MR. FREIMAN:  Your Honor, in Gonzalez v. Crosby, the

24  Court said --

02:33:57  25         THE COURT:  Speak up.

1      MR. FREIMAN:  The Court said in Gonzalez v. Crosby a

2  defect in the integrity in the federal proceedings when raised

3  as the grounds for the Rule 60(b) is not a success -- doesn't

4  make the 60(b) into a successive petition.

02:34:17  5      Mr. Schaffer pointed to Gilkers v. Vannoy

6  discussing this law, and prior counsel's -- or federal habeas

7  counsel's conflict of interest is a defect in the integrity of

8  the federal proceedings under Fifth Circuit law.  So, it is --

9      THE COURT:  What about the other circuits?

02:34:43  10      MR. FREIMAN:  I thought binding precedent was enough,

11  your Honor.

12      THE COURT:  Court decisions are binding on the parties

13  to them.  They're persuasive or not persuasive depending upon

14  the facts and the quality of the reasoning.  Any judge in the

02:35:02  15  United States, not of three states in the middle south and early

16  southwest.

17      MR. FREIMAN:  Yes, your Honor.

18      THE COURT:  There's no Fifth Circuit in this book.

19      MR. FREIMAN:  Yes, your Honor.

02:35:17  20      THE COURT:  There's no Eleventh or worse, Court of

21  Federal Claims or whatever it is.

22      MR. FREIMAN:  I apologize, your Honor.  I understand.

23  The case that -- in which the Fifth Circuit held that is Clark

24  v. Davis, and I'd be happy to research to determine what other

02:35:35  25  Courts have held in applying the Gonzalez v. Crosby test.

1　　　　　THE COURT:  I suppose that takes care of limitations,

2　too?

3　　　　　MR. FREIMAN:  Under Rule 60(b), there is a reasonable

4　time requirement under 60(b)(6) -- or 60(b) -- excuse me, Rule

02:36:33　5　60(c).  And the -- our argument is that prior counsel's -- or

6　excuse me, federal habeas counsel's conflict of interest and our

7　recent appointment make any time -- any motion that we bring at

8　the conclusion of our investigation timely.

9　　　　　THE COURT:  So, where does that idea come from?  That

02:37:12　10　means there's never a time limit on anything because all you

11　have to do is recuse counsel, right?

12　　　　　MR. FREIMAN:  I disagree, your Honor.

13　　　　　THE COURT:  That's what you just told me.

14　　　　　MR. FREIMAN:  No, your Honor.  In this instance, the

02:37:33　15　circumstances couldn't be replicated.  The new intervening law

16　of Martinez and Trevino is the only conflict of interest that we

17　state could make --

18　　　　　THE COURT:  So, there was no defect at the time of the

19　trial?  You said the law was intervening.

02:37:50　20　　　　　MR. FREIMAN:  Allow me to explain further, your Honor.

21　Excuse me.  I misspoke.  In March, 2012, the Supreme Court

22　decided Martinez v. Ryan.  At that time, judgment had not been

23　entered in this Court.  Therefore, it was not intervening in a

24　direct sense because Mr. Schaffer could have raised it at that

02:38:21　25　time or at any time after that.

```
 1          THE COURT:  All right.  Let me talk to --
 2          MR. OTTOWAY:  Matthew Ottoway, your Honor.
 3          THE COURT:  You're who I get?
 4          MR. OTTOWAY:  Matthew Ottoway.
 5          THE COURT:  I know.  I get you?
 6          MR. OTTOWAY:  You do.
 7          THE COURT:  I had two out of three chance not to get
 8  you.  Come up here.
 9          MR. OTTOWAY:  May I bring some material with me?
10          THE COURT:  Yes, sir.
11          MR. OTTOWAY:  Thank you, your Honor.
12              Would you simply like a response to their
13  assertions?
14          THE COURT:  Answer all of those questions from your
15  point of view in the order they were asked quickly.
16          MR. OTTOWAY:  I will do my best, your Honor.
17              They had mentioned an ineffective assistance of
18  trial counsel claim regarding abuse.  If I might just quickly
19  read from the first state habeas application.  "Counsel did not
20  thereafter offer evidence of applicant's disadvantaged
21  background, although applicant's mother and sister could have
22  testified extensively about his troubled childhood.  Applicant
23  was conceived as a result of a date rape, and his mother often
24  told him that she did not want him for that reason.  He was
25  raised by his drug" --
```

02:39:10
02:39:28
02:39:40
02:39:58
02:40:14

1          THE COURT:  Isn't that abuse by the mother?

2          MR. OTTOWAY:  It is, your Honor.

3              "He was raised by his drug addicted mother in an

4    impoverished home.  She often left her children alone or with an

02:40:28    5    older cousin.  Most important, during childhood, applicant

6    sustained blows to the head in an auto accident and from being

7    hit with a baseball bat."

8              I think Mr. Schaffer's first state habeas

9    application --

02:40:38    10         THE COURT:  From a car accident or --

11         MR. OTTOWAY:  "Sustained blows to the head in an auto

12   accident and from being hit with a baseball bat," apparently,

13   both.

14             And during trial, there was a proffer offered by

02:40:55    15   Mr. Jennings that he was raised by his drug addicted mother in

16   an impoverished home; that he was often left alone without

17   supervision; that he was a poor student who left school in the

18   ninth grade; and that he was unable to deliberate on the date of

19   the offense due to his intoxication.

02:41:14    20             So, I think the issue of abuse was known to trial

21   counsel; and in fact, I think this Court granted -- or

22   recommended the grant of relief; and that was eventually

23   reversed.  So, I believe the issue of abuse has been raised in

24   this case.  It has been decided adversely against the Petitioner

02:41:34    25   by the Fifth Circuit.

1          The other question -- or the other potential

2    IATC, or ineffective assistance of trial counsel, claim was that

3    trial counsel were ineffective for failing to discover

4    applicant's drug abuse.

02:41:45    5          And in the third state habeas application filed

6    by Mr. Schaffer, quote, the ground three was "Trial counsel were

7    ineffective in failing to discover and present mitigating

8    evidence of applicant's extensive drug abuse."

9          So, these issues were raised.  They were raised

02:42:02   10    by Mr. Schaffer.  And so, at this point, any attempt to reraise

11    these in federal habeas would be second or successive regardless

12    of whether there was a conflict for Mr. Schaffer.

13          The ineffective assistance of trial counsel claim

14    regarding nullification, the Court of Criminal Appeals has found

02:42:26   15    that the nullification issue has been procedurally defaulted;

16    and at the time of trial, I believe Penry I had only just been

17    decided.  So, there was an open question as to what type of

18    mitigation instruction was applicable.

19          And I'm not sure how trial counsel could be found

02:42:45   20    ineffective for suggesting a mitigating instruction that

21    ultimately ended up being struck down by the Supreme Court in

22    2001, more than ten years after the time of trial.  Trial

23    counsel is not required to be prescient as to what the Supreme

24    Court might do a decade later.

02:43:04   25          THE COURT:  In a different case.

1    MR. OTTOWAY:  Correct, in a different case.

2         There is an argument that the Rule 60(b) motion

3    or the motion to reopen final judgment is a, quote, unquote,

4    true Rule 60(b) that can be considered by this Court.  It is

02:43:22  5    true that Clark mentions that the conflict itself is not a

6    second or successive application, but Clark goes on to discuss

7    that raising the trial counsel claims would then turn it into --

8    or possibly turn it into a second or a successive.

9         And Gonzalez v. Crosby, another case that was

02:43:42  10    discussed by my opposing counsel, indicates that the attempt to

11    raise new evidence or new claims or to even reargue old claims

12    is the quintessential second or successive petition.

13         And so, I see absolutely no vehicle for raising

14    any of these claims that could potentially garner merits review

02:44:05  15    by the Court.

16         THE COURT:  What was done with that proffer?

17         MR. OTTOWAY:  My recollection of the transcript is

18    that the trial attorneys attempted to have the Petitioner

19    testify without being subject to cross-examination.  When the

02:44:23  20    Court ruled against that and was going to allow full

21    cross-examination, they decided not to have him testify; and

22    they made strategic decisions not to call two of the witnesses,

23    I believe the Petitioner's sister and mother, for various

24    reasons.

02:44:45  25         THE COURT:  So, the proffer was never before the jury?

1    MR. OTTOWAY:  It was not, your Honor.

2    THE COURT:  But it was a proffer?

3    MR. OTTOWAY:  It was, your Honor.

4    THE COURT:  And known to everybody on the lawyer's

02:44:57   5  side?

6    MR. OTTOWAY:  Certainly, trial counsel.

7    THE COURT:  That's what I'm talking about.

8    MR. OTTOWAY:  Yes, your Honor.

9    THE COURT:  Everybody working that week.

02:45:06  10  MR. OTTOWAY:  Yes, your Honor.

11        And then, the one final point is that opposing

12  counsel suggested that this motion to reopen final judgment

13  would be timely.  I believe that issue has been decided against

14  them in Clark.  Clark says that the measurement point for the

02:45:24  15  conflict that might have been created by Martinez and Trevino

16  should be measured by the issuance of Trevino which is, I

17  believe, May of 2013.

18        And so, at this point, if that is the measurement

19  or the starting point, then any 60(b) motion would be five years

02:45:47  20  late; and that would never be timely.

21    THE COURT:  All right.  I think you've covered them.

22  Anything you want to add from your perspective?

23    MR. OTTOWAY:  We would rest on our briefs.

24        And unless the Court has any other questions, I

02:46:06  25  don't have anything additional to add.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

                    MR. FREIMAN:  Your Honor, may I offer a short

rebuttal?

                    THE COURT:  Pardon?

                    MR. FREIMAN:  May I offer a short rebuttal?

02:46:24            THE COURT:  In just a minute.

                    MR. FREIMAN:  Yes, your Honor.

                    THE COURT:  Mr. Schaffer.

                    MR. SCHAFFER:  I wondered if I could throw in at some

point.

02:46:47            THE COURT:  Mr. Schaffer.

                    You may sit down, Mr. Ottoway.

                    MR. OTTOWAY:  Thank you, your Honor.

                    MR. SCHAFFER:  Thank you.  May it please the Court.

                    I want to try and line this out a little bit so

02:46:59  you can understand what my thinking was.  At the time I filed

the federal petition around 2008, 2009, the issue was whether

trial counsel was ineffective at the punishment stage in failing

to present mitigating evidence of mental impairment and troubled

childhood.

02:47:19            You granted relief on that basis in a wonderful

opinion.  The only reason it did not survive the Fifth Circuit

is because of the AEDPA standard of review.  The law changed in

1997.  So, instead of you being able as an Article III District

Judge to do a de novo review of a state habeas case, you had to

02:47:38  defer to the State Court decision unless no reasonable judge

1  could agree, you know, which really ties your hands behind your

2  back.

3           So, you got reversed not because you were wrong

4  substantively.  It could have been a de novo standard of review.

02:47:54  5  Your opinion would have stuck, and Mr. Jennings would have

6  received a new trial on punishment.  But the law went against us

7  on that point, and the Fifth Circuit reversed.

8           What I was trying to accomplish by filing this

9  motion is under Martinez and Trevino if there has been a defect

02:48:10  10  in the state habeas proceeding and state habeas counsel was

11  ineffective in failing to raise particular errors of trial

12  counsel, then the Federal Court can do de novo review, not

13  AEDPA deference review but de novo review of that claim.  And if

14  you did de novo review, there is no State decision to defer to.

02:48:35  15           So, in going back and looking at what I had

16  raised and not raised in the passage of time, I found certain

17  areas where I thought I should have raised issues that I did not

18  raise; and I thought that if that could be brought to your

19  attention --

02:48:52  20           THE COURT:  Wait a minute.  Only on the state habeas.

21           MR. SCHAFFER:  Correct.  Correct.  I mean, on the

22  federal habeas, I had to raise what was raised in the state

23  habeas.  At that point in time, I couldn't raise a new issue

24  that was unexhausted.

02:49:03  25           But what I did not raise is that trial counsel

1  failed to present evidence of Jennings' pretty significant drug

2  abuse as a teen-ager that was documented in some reports, I

3  think, from either the facility where he was in or a presentence

4  investigation in an adult case.  And they also arguably were

02:49:24  5  ineffective in requesting a nullification instruction that

6  subsequently was found not to be a Constitutional response to

7  Penry.

8  　　　　　Now, my view of when the time started running on

9  -- under Martinez and Trevino is different from what my

02:49:46  10  colleague suggests.  He says the time started running when

11  Martinez and Trevino were decided.  But bear in mind that at the

12  time Trevino was decided in 2013 which said that Martinez

13  applies in Texas, you can do de novo review if state habeas

14  counsel was ineffective in failing to raise an ineffective claim

02:50:07  15  by trial counsel that was substantial.

16  　　　　　At that time, I had a decision from you granting

17  relief.  It would have made zero sense for me to file some

18  motion in your court saying, "Hey, you need to appoint

19  independent counsel to look at whether I failed to raise certain

02:50:21  20  issues in a case I just won."  That would have been ridiculous.

21  　　　　THE COURT:  You didn't move to reconsider it either.

22  　　　　MR. SCHAFFER:  No, I didn't.  I was going to leave

23  well enough alone until somebody else tossed it.

24  　　　　　So, at that time, it never would have occurred to

02:50:37  25  me to do something like that because I was in the driver seat,

1  albeit very briefly.  Then, obviously, we got a lot of play on

2  this because I think we spent three more years before the Fifth

3  Circuit twice and the Supreme Court once debating various

4  points.

02:50:53  5  We were ping-ponging it back and forth.  So, at

6  the time the Supreme Court denied cert from the federal habeas,

7  which I think was roughly January of '16, and Mr. Jennings got

8  an execution date, then I went back and filed both a subsequent

9  writ in State Court and a suggestion for reconsideration of the

02:51:12  10  first writ based on the issues that I have now identified before

11  you.

12  And the reason I did that instead of coming back

13  here to you is because by 2016 state law was pretty clear that

14  the Court of Criminal Appeals could consider these type of

02:51:30  15  issues, that is, nullification instruction error, both on a

16  subsequent writ -- and I cited three or four cases where they

17  did -- and on a reconsideration of a previous writ.

18  So, I had plenty of authority that I thought was

19  good -- and it's still good -- saying you can raise this on a

02:51:48  20  subsequent writ or in a suggestion for reconsideration.  So,

21  once again, what would the reason have been to go to Federal

22  Court when I had a vehicle in State Court to raise these issues?

23  So, I went to State Court; and they held it for,

24  give or take, maybe two and a half years and came out with a

02:52:07  25  bunch of splintered opinions on the subject.  But Jennings' case

1  in State Court is an outlier in the sense that I've cited other

2  cases where they granted relief off of subsequent writs or

3  suggestions for reconsideration.

4          They did not do it in his case, and there is no

02:52:24  5  explanation as to why and, indeed, no logical reason I can

6  discern other than the fact that a police officer was murdered;

7  and you know that the rules of the game change when a police

8  officer is murdered especially in a system where there are

9  elected officials.  And that's the main problem Mr. Jennings had

02:52:44  10  is his victim.

11          So, at the point in time when the CCA -- I want

12  to say in May of '18 --

13          THE COURT:  That could also be a problem with the

14  jury.

02:52:58  15          MR. SCHAFFER:  Always.  Always.  Unless you got some

16  real strong evidence of the story of his life that would produce

17  some reason for, at least, one juror to vote in favor of a life

18  sentence.

19          But that said, when the CCA denied relief in May,

02:53:14  20  one of the opinions -- and I don't remember which one --

21  observed that, if there had been a suggestion for

22  reconsideration of the earlier writ like in some other case, we

23  might have done something for you.

24          So, I filed both the rehearing; and I filed the

02:53:27  25  suggestion for reconsideration, again, because I had been given

1  that sort of little hint "Do it as a suggestion for

2  reconsideration."  So, I did.

3          They held it until September the 19th; but in the

4  meantime, knowing that things could go wrong, I prepared the

02:53:42  5  motion for conflict-free counsel.  It was sitting on my desk

6  waiting for the CCA to act; and I think they acted on, I'm going

7  to say, September 19th; and this motion was filed on September

8  20th.

9          So, in my little mind and the way I perceived the

02:53:56  10  universe, it seemed to me that the Martinez, slash, Trevino

11  timeline started not when the cases were decided because those

12  cases say nothing about federal habeas counsel can't represent

13  the Petitioner if he was also a state habeas counsel, they just

14  provide a set of circumstances where the District Judge can do

02:54:18  15  de novo review and have a hearing.

16          It's only an interpretation of Martinez and

17  Trevino that I think the Fifth Circuit made in roughly 2015 in

18  Mendoza that suggested that federal habeas counsel and state

19  habeas counsel should never be the same person because of the

02:54:34  20  possible conflict of interest if state habeas counsel made a

21  mistake in some way failing to challenge the effectiveness of

22  trial counsel.

23          And then, if he's still representing the

24  Defendant in Federal Court, obviously, "A," he's not going to

02:54:47  25  recognize the mistake he made in State Court; and "B," if he

1  did, he would have reasons not to raise it because he would make

2  himself look like a schlemiel, you know.  So, that was the

3  theory.

4          THE COURT:  No, no.  He would look like an honest man.

`02:55:00` 5          MR. SCHAFFER:  Well, you know, there is that; but most

6  lawyers, you know, would rather not look like a schlemiel.  So,

7  my point is I wasn't going to call myself out until it was

8  necessary to call myself out.  And the CCA, quite frankly,

9  disappointed me by not following their own precedent.

`02:55:21` 10          THE COURT:  You had a strategic plan.  It wasn't out

11  of negligence or stupidity.

12          MR. SCHAFFER:  As far as filing the conflict motion.

13          THE COURT:  Everything you've done.

14          MR. SCHAFFER:  Well, no, I'm not going to say

`02:55:32` 15  everything I've done.  I mean, I think I've made some mistakes

16  along the way.  I do.  But you know, I aspire to perfection.  I

17  really do.  But I've about reached the conclusion that I'm not

18  going to achieve it in this lifetime.  You know, I may bat .900

19  or .950; but I'm not going to hit a thousand.

`02:55:51` 20          So, you know, but I'm man enough to say I can

21  make a mistake; and if I did, somebody else should look at it.

22  My point is I thought the time to file the motion was once the

23  CCA rejected the claims; and quite frankly, although I am a

24  ridiculous optimist, I actually believed they would follow their

`02:56:07` 25  own precedent.

1           And remember, at the point in time when they

2 ruled against me, Judge Atlas had ruled in the Williams' case

3 that evidence of remorse cannot properly be considered under the

4 -- with a nullification instruction; and Williams is the exact

5 opposite of Jennings because in Jennings' case they said -- you

6 know, they said it could be opposite.

7           The State did not appeal Judge Atlas's decision

8 which, to me, meant the State was conceding that her decision

9 not only was correct but that Supreme Court precedent required

10 that outcome; and it was not an unreasonable application of

11 Supreme Court precedent.

12           So, again, I expected the Court of Criminal

13 Appeals to give some credence to that; but instead, they said,

14 "We don't have to follow the opinion of a Federal District

15 Judge." So, there. So, you got --

16        THE COURT: I've heard that before from different

17 people.

18        MR. SCHAFFER: And they just don't understand the

19 pecking order, do they?

20        THE COURT: Yeah.

21        MR. SCHAFFER: But you have this situation. You have

22 Jennings fixing to be executed with a nullification instruction

23 and evidence at trial that in Williams got him a new trial on

24 punishment. And as you may know, like, a week or two ago, the

25 State agreed to a life sentence.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          So, Williams' life was spared.  He killed a

2   police officer under circumstances somewhat similar to Jennings.

3   Not exactly, not as bad probably; but his life was spared with

4   the same flaw that exists in the Jennings' case.

02:57:40  5          So, my reason for doing this is because I think

6   there is a way -- and whether my colleagues have identified it

7   or not, that's not for me to say.  I think there is a way they

8   can get this before you through a 60(b) where you can do de novo

9   review of these claims that were procedurally defaulted in State

02:58:01  10  Court and that the CCA refused to address on the merits in the

11  subsequent writ and the suggestion for reconsideration in

12  contravention of their precedent in every other case.

13          THE COURT:  That's not a defect in the federal writ.

14          MR. SCHAFFER:  No, no, I'm not saying it is; but I'm

02:58:18  15  saying --

16          THE COURT:  Somebody kept saying it needs to be a

17  defect in the -- that it taints the federal process.

18          MR. SCHAFFER:  Well, correct.  But I think -- and

19  again, I shouldn't be arguing my own ineffectiveness; but I

02:58:33  20  think it is arguable that if federal habeas --

21          THE COURT:  You want me to do it.

22          MR. SCHAFFER:  I would be honored, and I hope it would

23  stick this time.  If federal habeas counsel has, in fact, a

24  conflict of interest and as a result does not raise certain

02:58:55  25  issues, then I think there is a defect in the integrity of the

1  proceeding, not because he's a bad person or maybe even because

2  he recognized he had a conflict at the time.

3           Because, remember, in 2009 Martinez and Trevino

4  didn't exist.  I was good as gold representing him in State --

02:59:10  5  in Federal Court after representing him in State Court.  The

6  issue came up only as a result of Martinez and Trevino.  So, I'm

7  not going to, you know --

8           THE COURT:  Why are we going to apply it retroactively

9  then?

02:59:21  10          MR. SCHAFFER:  I beg your pardon?

11          THE COURT:  Why should I apply it now and skip back

12  over everything being done right at the time?

13          MR. SCHAFFER:  Well, because I don't -- there's no

14  decision that I'm aware of that says it would not be

02:59:34  15  retroactive.  I think it applies to -- you know, I think

16  arguably it applies to all cases that are in the pipeline as of

17  the date that was decided; and this case was in Federal Court

18  when Martinez and Trevino came down.

19           I think it was in your court when Martinez came

02:59:47  20  down.  You granted relief.  And I think it was in the Fifth

21  Circuit when Trevino came down.  I could be off a little bit,

22  but I think that's the way it went.  So, I mean, that's my

23  position.  I wanted you to be aware of it.  My feelings don't

24  get --

03:00:02  25          THE COURT:  I know it's not -- I do not remember, you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  will understand, the facts at the time, the first time.  Too

2  many cases.

3         MR. SCHAFFER:  Understood.

4         THE COURT:  A little over my forehead.  But I don't --

03:00:24  5  did the State present the evidence about the proffer and the

6  discussion originally?  I just don't remember.

7         MR. OTTOWAY:  In what sense, your Honor, present it

8  when?

9         THE COURT:  To me.

03:00:35  10        MR. OTTOWAY:  Well, I think that was raised in

11  Mr. Schaffer's initial federal habeas application.  In fact, you

12  know, I believe the proffer was the basis of why -- or that

13  trial counsel should have called witnesses to support that

14  proffer, and that's what ultimately you granted relief on.

03:00:58  15            So, we did not present it, your Honor.  It was

16  certainly in the transcript that you had before you, and I

17  believe Mr. Schaffer raised it in the application.

18        THE COURT:  I don't recall then discussing whether

19  there was a strategic basis for not calling the mother and

03:01:20  20  sister and --

21        MR. SCHAFFER:  You found there was not, and the

22  lawyers did not suggest that there was.

23        THE COURT:  But if you don't present it --

24        MR. SCHAFFER:  If I can say one more thing; and then,

03:01:36  25  I'm going to sit down and stop talking.

1    THE COURT:  You're welcome here.

2    MR. SCHAFFER:  Well, I appreciate that.  I think that

3 maybe there might have been a little bit of confusion at the

4 outset because the discussion was had about evidence of

03:01:47 5 childhood abuse and troubled childhood and that sort of thing,

6 an issue that has been litigated all the way through the state

7 and federal systems; and so far, you're the only judge to have

8 found that it was bad enough to require relief.

9    So, really, that ship to me had sailed.  Now,

03:02:02 10 whether there are some other instances of troubled childhood

11 that they are saying that I should have found out about and

12 offered, I mean, I don't know that; and I'm guessing that's what

13 they're saying.  But that would be just a matter of degree.

14    I think the issues that are in play are the ones

03:02:18 15 I've identified in the motion; and of course, I would defer to

16 anything else they've done.  I don't want to step on their

17 position, but I think it may have gotten a little confusing

18 because you-all were talking about an issue that's already been

19 resolved.

03:02:31 20    And you know, anyway, appreciate visiting with

21 you.

22    THE COURT:  Certainly.

23    So, if the evidence, Mr. Ottoway, shows now that

24 the witnesses were not neglected to have been called, they were

03:02:52 25 considered and rejected for reasons known to the trial counsel?

1      MR. OTTOWAY:  Yes, your Honor; and that's been

2   adjudicated in both State Court and Federal Court, as

3   Mr. Schaffer said.

4      THE COURT:  And so, I held that there were not

03:03:11   5   plausible grounds for not doing it?

6      MR. OTTOWAY:  I believe what you held, your Honor, was

7   that it was not a reasonable decision, the State Court decision

8   was not reasonable affirming those strategic decisions that

9   trial counsel proffered.

03:03:33   10      THE COURT:  And I knew all about who the witnesses

11   were and --

12      MR. OTTOWAY:  I believe so, your Honor.

13      THE COURT:  -- what they had to offer?

14      MR. OTTOWAY:  Again, I believe so.  I think the Fifth

03:03:45   15   Circuit ended up reversing you on that point.  So, I believe it

16   was known to the Fifth Circuit.  I believe it was known to you.

17   The issue of abuse was something --

18      THE COURT:  So, the answer, though, is they were not

19   inadequate?

03:04:02   20      MR. OTTOWAY:  That is correct.  That is ultimately

21   what the Fifth Circuit determined.

22      THE COURT:  You know, unlike his holdings that apply

23   to the universe, those holdings apply to this case.

24      MR. OTTOWAY:  They do, your Honor.

03:04:22   25      THE COURT:  So, there is no need to reraise that.  I

1 mean, in this case in Federal Court, that argument has been

2 presented and lost.

3            MR. OTTOWAY: And if I may, your Honor. In addition,

4 what has also developed in federal habeas is Cullen v.

03:04:45  5 Pinholster which says that, if a claim has been adjudicated by

6 the State Court, additional evidence cannot be considered. So,

7 even if we didn't have to get through the second or successive

8 bar here, Pinholster would also block the consideration of this

9 additional evidence of abuse or anything that could have

03:05:02  10 potentially been mitigating because that mitigation claim, the

11 ineffective assistance for failing to present enough mitigation,

12 has been adjudicated by the State Courts, your Honor.

13            THE COURT: Could you say that again.

14            I'm going to guess the death penalty for this

03:05:25  15 reason -- this reason: It's become incredibly tortured and,

16 basically, lots of decisions, it seems to me, to be calculated

17 to discourage people from seeking capital punishment for what I

18 will call moral or political reasons but minor practical, like,

19 economic is really -- is, like, five times more to get a death

03:06:00  20 judgment than it is to keep life in prison.

21            Also, it focuses the public attention on

22 idiosyncratic crimes in an area of the law where the law is all

23 messed up and we don't look very good in a Constitutional

24 respect sense. There are several more that I am bound by the

03:06:27  25 existence.

                    The State wouldn't consider just saving some
money and dropping the -- commuting -- whatever you -- commuting
the punishment?

                    MR. OTTOWAY:  Commutation.  That decision would have
to be made by the independently-elected District Attorney's
Office, your Honor.  I represent the State through the Attorney
General's Office, and I don't have that prosecutorial authority.

                    So, that would be a matter that would need to be
dealt with the District Attorney; but the State in representing
federal habeas --

                    THE COURT:  I bet you his number is listed.

                    MR. OTTOWAY:  Her number is probably listed, your
Honor.

                    THE COURT:  Why don't you call her?

                    MR. OTTOWAY:  I don't think she would talk to me, but
she would probably talk to my boss.

                    THE COURT:  Which boss?

                    MR. OTTOWAY:  My division chief.

                    THE COURT:  You mean nobody likes you?

                    MR. OTTOWAY:  I'm pretty sure that's the case, your
Honor.

                    THE COURT:  Okay.  I don't feel so bad now.

                    MR. OTTOWAY:  But the State, as it is represented by
the Attorney General here, is opposed to a stay of execution,
your Honor.

1          THE COURT:  I gathered that.  But if your boss

2    calls -- it's worth a phone call.

3          MR. OTTOWAY:  I will certainly make sure that the call

4    is made to the District Attorney's Office, your Honor.

03:07:49  5          THE COURT:  It doesn't hurt to ask.

6          MR. OTTOWAY:  It does not.

7          MS. HAYES:  Your Honor, I'm Katherine Hayes with the

8    Attorney General's Office.

9          THE COURT:  And you're uncurable.

03:08:05  10         MS. HAYES:  I've been -- I've been in contact with the

11   District Attorney's Office, with Josh Reiss and David Barr; and

12   they certainly have not given any indication of any thought of

13   commutation.  They have opposed the clemency petition, and they

14   would have been here today.  But David, I believe, still has the

03:08:24  15   flu.  So, please don't inflict that on anyone here.

16         THE COURT:  We don't want him anyway.

17         MS. HAYES:  Right.

18         THE COURT:  And with the flu, we really don't want

19   him.

03:08:33  20         MS. HAYES:  Exactly.  So, I know that's their

21   position.

22         THE COURT:  You know that guy who had to ask you nine

23   times before you'd consider to marry him?  Somebody says no the

24   first time, sometimes it makes sense to ask them again.  I mean,

03:08:47  25   it's been 30 years.  It's not like I'm asking you to consider

1  taking him home with you.

2         MS. HAYES:  I just want to make sure you knew that --

3  why they did not appear.

4         THE COURT:  He's fine.  I just want somebody who knows

03:09:10  5  the facts of the case and is responsible for them because

6  sometimes large organizations and somebody eight levels down

7  because nobody wants to come here.  And then, the poor kid

8  doesn't know anything.

9         MR. OTTOWAY:  I enjoy coming here, your Honor.

03:09:31  10         THE COURT:  You don't fit the kid category anymore.

11              Thank you, ma'am.

12         MS. HAYES:  Thank you.

13         THE COURT:  All right.  Let's take a 20-minute recess.

14  I'll go consult my brain trust.

03:09:54  15     (Court recessed at 3:09 p.m.)

16     (Court resumed at 3:31 p.m.)

17         THE COURT:  Anything else before we adjourn for me to

18  write something?

19              Mr. Mallett?

03:31:42  20         MR. MALLETT:  I don't think I have anything to add

21  that hasn't been said.  I do want to say one thing, though.  I

22  can't -- you call on me, I'm going to talk.

23              In opposing my appointment, the State was

24  concerned about the extension permitted under 28 USC 2251(a)(3);

03:32:10  25  and they argued it again in opposing the appointment of my

1  colleagues from the Federal Defender's Office saying appointment

2  of the Capital Habeas Unit from the Western District will

3  inevitably cause delay.

4              If you can give them their full 90 days, I think

03:32:28  5  it will be in conformity with the statute; and that's all we

6  came to ask for.

7          THE COURT:  In 89 days, you can hire another lawyer;

8  and the 90 days does not run.

9          MR. MALLETT:  He's found to be unable to hire his own

03:32:45  10  lawyer, and you have made me his lawyer respectfully.

11          THE COURT:  I appointed you.  Then, I added them.  But

12  that doesn't restart the clock when I added them.

13          MR. MALLETT:  Well, actually, not clear.  The statute

14  says 90 days from appointment of counsel, but it's not a

03:33:10  15  mandatory 90 days.  I think you have the discretion to give them

16  90 days.  I don't think there's anything in the statute that

17  says the Court must give.

18          THE COURT:  I suppose I could give them 180.  I

19  thought the circuit --

03:33:28  20          MR. MALLETT:  I think we need to get papers on file

21  for you to do that.  I'm not absolutely certain because -- we

22  have an argument that there's a potential pending based on

23  Mr. Schaffer's motion; but as a practical matter, we're not

24  asking for that.

03:33:45  25          THE COURT:  Mr. Schardl?  Is that close?

1          MR. SCHARDL:  Yes, your Honor, right on.

2          THE COURT:  You've been very nice and let them go on

3    endlessly.  Anything you'd like to add?

4          MR. SCHARDL:  No, your Honor, I don't think so.  I

03:34:02  5    think that Mr. Mallett raised the issue about our appointment;

6    and we hope that you will give us the opportunity to present you

7    with evidence that no Court has seen previously and no Court has

8    had the opportunity to adjudicate.

9          THE COURT:  What is entirely new?

03:34:32  10         MR. SCHARDL:  Well, your Honor --

11         THE COURT:  I heard about the abuse.  I heard about

12   all the -- I heard about everything that the Court of Criminal

13   Appeals has heard.

14         MR. SCHARDL:  I don't believe that's the case, your

03:34:47  15   Honor, because -- we could speak about categories like --

16         THE COURT:  I want to know facts.

17         MR. SCHARDL:  I do, too, your Honor.  That's why we're

18   asking for those 90 days to be in place.

19         THE COURT:  No.  You keep --

03:34:58  20         MR. SCHARDL:  I don't have them all, your Honor.

21   That's why we're asking for the time.

22         THE COURT:  And it doesn't appear anywhere in all the

23   proceedings and all the lawyers.

24         MR. SCHARDL:  That's the nature of the ineffectiveness

03:35:17  25   claim, your Honor.

THE COURT:  No.  The argument is that the jury charge is not consistent with the law somewhat later.  And then, back to the original question about not calling any and producing any exculpatory evidence or mitigating -- mitigating, not exculpatory.  Those have been considered several times.

MR. SCHARDL:  Well, the claim about the jury instruction was never adjudicated on the merits due to the default; and --

THE COURT:  Does it have merit that he didn't anticipate a ruling by the Supreme Court years later?

MR. SCHARDL:  Yes, I believe it does, your Honor. There were -- one of the things that we have accomplished is to speak to other lawyers who were practicing here in Harris County at the time to determine what the state of the professional norms were, what the practice was at that time and --

THE COURT:  It's the law, counsel.

MR. SCHARDL:  Yes, your Honor.  But the law was open-ended at that time because of Penry.  So, the attorney in this case agreed to something new.

THE COURT:  If the other lawyers in Houston approached it differently and happened to be right, some others would have approached it differently and been wrong.

MR. SCHARDL:  The issue, your Honor, if I may, is whether counsel's approach was reasonable, not whether he guessed right in this case.

1          THE COURT:  I'm not talking about him, I'm talking

2    about other lawyers that you're going to poll.  And you're

3    familiar with statistical reliability, aren't you?

4          MR. SCHARDL:  I am, your Honor.  I think in this case

03:37:21  5    what we have learned is that the decision to accede to the

6    District Attorney's instruction was not a reason decision; it

7    was a snap decision made without any deliberation, consulting

8    the law, or looking into it at all.  And that would be an

9    unreasonable decision, as well.

03:37:47  10          THE COURT:  Not if it was consistent with the law at

11    the time.

12          MR. SCHARDL:  And we know, however, from Penry II that

13    the Supreme Court has said that instruction was not consistent

14    with the law that existed at the time Penry I came out.  That

03:38:05  15    was the Supreme Court's holding in Penry II; but it was never

16    right from the beginning; and had trial counsel consulted that

17    law, they would have come to the same conclusion.

18          THE COURT:  And how many Courts used one that was

19    acceptable to -- so, basically, Penry II says what Penry I

03:38:33  20    really meant?

21          MR. SCHARDL:  Penry II says it would be unreasonable

22    -- the holding was it was unreasonable under AEDPA for the Texas

23    Courts to have thought the instruction in this case was okay.

24    It was unreasonable for the State Court to think that

03:38:51  25    instruction ever --

1          THE COURT:  The State Court in Penry?

2          MR. SCHARDL:  In -- well, any State Court --

3          THE COURT:  No, you can't do that with a Court

4    decision, counsel.  We're not legislators.

03:39:10   5          MR. SCHARDL:  I apologize, your Honor.  I misspoke.

6          THE COURT:  No.  Even the Supreme Court would say it's

7    a binding precedent.  That's called res judicata.  Otherwise,

8    it's persuasive.  You know, they get things wrong; and

9    sometimes, they fix them up there in Washington.  Give them a

03:39:27  10    hundred years.

11              You have no data on how many people were affected

12    by Penry II?

13          MR. SCHARDL:  Actually, your Honor, I believe I do.  I

14    don't have it at my fingertips, but I believe I could come up

03:40:03  15    with that.

16          THE COURT:  When?

17          MR. SCHARDL:  By Tuesday.

18          THE COURT:  It's Wednesday.  Where are you going to go

19    to get it?

03:40:19  20          MR. SCHARDL:  We have colleagues who have been

21    compiling lists of cases affected by Penry I and Penry II.  I

22    don't know, we may have that available by tomorrow.

23          THE COURT:  All right.  That would be good.

24          MR. SCHARDL:  A list?

03:40:43  25          THE COURT:  Or just give me the number.  But just make

1  sure you're -- I guess you need to list them because Ottoway's
2  got some gaps in his schedule tomorrow afternoon.  Just a list
3  of cases.
4          MR. SCHARDL:  Very well, your Honor.
03:41:02  5          THE COURT:  I'm less confident that Mr. Jennings may
6  be about the accurate appraisal of actions done in reliance of
7  one Supreme Court case when their jurisprudence on this subject
8  is evolving.
9              All right.  Mr. Schaffer.
03:41:39  10          MR. SCHAFFER:  Yes, sir.
11          THE COURT:  Anything else?
12          MR. SCHAFFER:  No, your Honor.
13          THE COURT:  Mr. Freiman.
14          MR. FREIMAN:  Yes, your Honor.  I have a few points in
03:41:50  15  response to Mr. Ottoway.  Mr. Ottoway has confidently asserted
16  that various propositions --
17          THE COURT:  Move the microphone up a little bit.
18          MR. FREIMAN:  Mr. Ottoway has confidently asserted
19  that various propositions regarding the procedural obstacles to
03:42:11  20  hearing this never-before-heard nullification issue prevent us
21  in this case.
22          THE COURT:  Why do you use "nullification"?
23          MR. FREIMAN:  I used the word "nullification."
24          THE COURT:  Yes.  Why?
03:42:28  25          MR. FREIMAN:  Because at trial Mr. Jennings' trial

counsel requested an unconstitutional nullification instruction

at the request of the prosecutor in this case and the district

attorney at the time, Johnny Holmes.  That is a trial

ineffectiveness issue that was defaulted in your court and can

be heard.

That claim does not meet all those barriers.

THE COURT:  Why did you use the word "nullification"?

What are we nullifying?

MR. FREIMAN:  In 1989 in response to Penry v. Lynaugh

which had just come down, the Harris County District Attorney

had to invent a new way of trying to give mitigating effect to

any evidence the trial counsel might present.

It was a totally experimental instruction at the

time, and trial counsel --

THE COURT:  We've made progress.

MR. FREIMAN:  -- trial counsel was unaware that Penry

had even been decided.  All these facts --

THE COURT:  Wait a minute.  This isn't a pop quiz they

may have missed something on.

MR. FREIMAN:  No, your Honor, it wasn't.

THE COURT:  Why are you using the word

"nullification"?

MR. FREIMAN:  The word "nullification" is the term of

art that the Supreme Court and this Court and other Courts have

used regarding this instruction because it told the jury that,

1  if the special issues that were -- the three questions that the

2  statute required the jury to answer in the affirmative couldn't

3  give effect to mitigating evidence but the jury still wanted to

4  give some mitigating effect, then they could nullify those

03:44:24  5  instructions.  That's where the term comes from.

6          THE COURT:  Like John C. Calhoun.

7          MR. FREIMAN:  I have to refresh my memory of American

8  history, your Honor; but yes, that's the same term.

9          THE COURT:  Vice President Calhoun of South Carolina

03:44:43  10  and his people said that South Carolina could vote and decide

11  which federal laws it wanted to obey.  Sort of like San

12  Francisco which is using its -- the left fringe is simply

13  copying a philosophy of --

14          MR. FREIMAN:  Yes, your Honor.

03:45:11  15          THE COURT:  South Carolinians, they don't know any

16  history either.  They think they invented the whole idea.

17          MR. FREIMAN:  And that term "nullification," your

18  Honor, is exactly right and used in just the same way.  Just

19  like there, the jury was asked to decide on their own which

03:45:34  20  special issues -- they didn't allow them to give mitigating

21  effect to evidence that trial counsel could and should have put

22  on.

23               And trial counsel for Mr. Jennings --

24          THE COURT:  But there's a difference between having

03:45:49  25  the correct instruction and having good witnesses.

<div style="margin-left:0">

1        MR. FREIMAN:  Your Honor, it can't be the case that

2  trial counsel's twin failures of both doing no mitigation

3  instruction and putting on an unconstitutional instruction

4  allowed him to evade review.  The fact is that trial counsel

03:46:14  5  both didn't do an adequate mitigation investigation, putting on

6  only one witness who barely knew our client, and second --

7        THE COURT:  Wait a minute, counsel.  Have you ever

8  tried a criminal case for the Defendant?

9        MR. FREIMAN:  No, your Honor.

03:46:34  10        THE COURT:  That one poor witness may have been the

11  best witness.

12        MR. FREIMAN:  In the abstract, I would agree with you,

13  your Honor; but what --

14        THE COURT:  No.  In this case, there's lots of

03:46:48  15  non-abstract.  He didn't put the mother on.

16        MR. FREIMAN:  That's correct, he didn't put the mother

17  on.

18        THE COURT:  A drug addict, childhood-abusing

19  prostitute?

03:47:01  20        MR. FREIMAN:  Yes, your Honor.

21        THE COURT:  Does that sound like good mitigating

22  evidence to you?

23        MR. FREIMAN:  To me, your Honor, the chaos in his home

24  that was occasioned by living with the mother who was a drug

03:47:13  25  addict, abusive prostitute would have been mitigating; and the

</div>

1    Supreme Court has said so.

2              THE COURT:  And when did it say so?

3              MR. FREIMAN:  It said so in <u>Wiggins v. Smith</u> and in

4    <u>Penry v. Lynaugh</u> itself.  In <u>Penry</u> the Court --

03:47:34    5    THE COURT:  When?

6              MR. FREIMAN:  That was 1989, your Honor, on the eve of

7    trial.

8                   That's correct.

9                   Mr. Mallett corrects me.  It was on June 26,

03:47:46   10    1989, which was after the jury had been selected but prior to

11    the punishment stage; and our counsel, trial counsel for our

12    client, did nothing to educate himself about this fundamental

13    change in capital sentencing law.  This was -- this was --

14              THE COURT:  Wait a minute.

03:48:08   15    MR. FREIMAN:  Yeah.

16              THE COURT:  The next day he had done nothing?

17              MR. FREIMAN:  It wasn't just the next day, your Honor.

18    According to the state habeas application, he wasn't aware of

19    the decision in <u>Penry</u> until July 12th.  So, it was almost a

03:48:28   20    month later; and the reason he learned of it --

21              THE COURT:  When did he try the case?

22              MR. FREIMAN:  He tried it during that period without

23    knowledge of <u>Penry</u> itself.  That is what the record establishes.

24              THE COURT:  You do much basic updating research of the

03:48:48   25    law while you're trying a case?

MR. FREIMAN:  My understanding, Judge, is that, if it's the statutory issues that you're supposed to put on and it's about the law of capital sentencing in Texas and you're doing a capital sentencing, then you have to learn of that; and it was front page news.  It wasn't buried in some hornbook.  It was front page news at that time.  This was a five-to-four decision.

THE COURT:  That's a very glib attitude towards the rigors of being a trial counsel.

MR. FREIMAN:  Your Honor, I don't mean to dismiss the rigors of trial counsel; but presenting a capital sentencing trial is a very serious and difficult task, as the Supreme Court has described many times.  Only experienced and qualified and well-educated counsel can perform the tasks sufficiently well to represent the client.

Here, he wasn't aware of the most important Supreme Court decision on Texas capital sentencing while he was in the middle of a Texas capital trial.

THE COURT:  I repeat my observation.

MR. FREIMAN:  Yes, your Honor.  I'll add that at that very time --

THE COURT:  I was a famous criminal lawyer.  I tried a Deer Park abusive language to a police officer case and lost.  That's the entire extent of my criminal experience until I got this job.  I was -- I tried a grammatical defense.  He said --

1  and I quote -- to the officer who was something on the order of

2  hassling his friend who had been waiting outside the store when

3  my client exited, he said, "What the fuck's the matter with

4  you?"

03:50:53  5      And I argued that that had no attribution of

6  demeaning or threatening or abusing the officer, it was just an

7  expletive.  And this was before President Nixon.  So, I didn't

8  have high authority about the use of expletives.

9      Apparently, grammar wasn't big in Deer Park.  For

03:51:18  10  those of you who are not Houstonians, it's an industrial suburb

11  to the east.

12      Grammar is not a big thing in municipal court.  I

13  think that it's awesome.  It, first of all, failed; but it also,

14  broadly interpreted, was a 1st Amendment question.  That's how I

03:51:35  15  ended up doing it.  I lost on both counts.

16      MR. FREIMAN:  I'm sorry to hear that, your Honor.  You

17  were famous nonetheless.

18      THE COURT:  I have a perfect record for criminal

19  cases.  All lost.

03:51:49  20      All right, what else?

21      MR. FREIMAN:  Well, may I say?  So, what else -- what

22  else makes this extraordinary is that, instead of educating

23  himself at that moment about what his obligations were when

24  presenting the capital sentencing, instead, he took what he was

03:52:07  25  given by the district attorney and then turned it in as his own

1  homework to the Court.

2          And that laundered a prosecution supplemental

3  instruction that would later be found to be unconstitutional in

4  <u>Penry v. Johnson</u> and made it a defense request, and that has a

03:52:29  5  number of negative effects on the ability of Mr. Jennings to

6  raise this issue in the State Courts.

7          As the prosecution argued on appeal, they said,

8  "That's an invited error.  Your defense counsel raised that."

9  So, we can see how defense counsel's deficiency harmed our

03:52:46  10  client; and furthermore --

11          THE COURT:  It's got to be more than, what are we, 30

12  years later deciding to criticize things in the cold comfort of

13  this room?

14          MR. FREIMAN:  Your Honor, I take your point; however,

03:53:16  15  Supreme Court precedent at the time, as Mr. Schardl said, said

16  that it was clearly established, even at that early moment right

17  after <u>Penry</u>, that counsel should have known what the 8th

18  Amendment required.

19          THE COURT:  That's a real cute thing.  What it means

03:53:38  20  during my short 53 or four or five, six years of being a lawyer,

21  the language of the 8th Amendment subsists.  But what it means

22  has changed considerably, some for the better, because -- not

23  because the Constitution has changed but the circumstances to

24  which it applies.

03:54:07  25          When it was written, there would be one drunk in

1  the county jail and everybody in town would know he was there

2  and know where he had been when he was drunk; and whether he got

3  appointed counsel or was seen promptly wasn't a particular

4  thing.  It's not quite like the -- I'm trying to think of the

03:54:41  5  county Atlanta is in.  Peachtree probably.

6       MR. FREIMAN:  It's in multiple counties, your Honor.

7       THE COURT:  Yeah.  As of now, it's a whole bunch of

8  them.  Fulton --

9       MR. FREIMAN:  Fulton.

03:54:48  10       THE COURT:  -- is the core.  The Fulton County Jail in

11  1966 was somewhat different from the Charlottesburg (phonetic

12  spelling) -- Charlottesville, Virginia, County Jail in 1789.

13  And the rule had to be applied to these circumstances, and the

14  rule meant the same thing.  Its effects were different, but

03:55:16  15  it --

16       MR. FREIMAN:  Yes, your Honor.  I just ask that when

17  we -- that the Court consider the -- that Supreme Court

18  precedent on this 8th Amendment issue has not varied since 2001;

19  and really --

03:55:30  20       THE COURT:  Since 2001?

21       MR. FREIMAN:  Since 2001.  And we now have judges who

22  assure us that they follow precedent on precedent, and they

23  recognized this precedent.  And their precedent says that that

24  supplemental jury instruction when applied to evidence of

03:55:47  25  childhood abuse was unconstitutional, and it was so clear that

1  that was the case that any jurist should have known it; and by

2  extension, any reasonable counsel who had consulted what the 8th

3  Amendment said and even looked at the case that set out the

4  standard would have known that.

03:56:11  5          Now --

6          THE COURT:  There's an old saying:  Hell hath no fury

7  like non-combatants.  The people who are viewing that, people

8  like bald professors and people with a vested interest in the

9  opposite view all find it quite easy and obvious.

03:56:36  10          MR. FREIMAN:  Your Honor, if I may, I would like to

11  address also those procedural obstacles regarding what

12  Mr. Ottoway said.  Mr. Ottoway raised a number of ways he

13  believes that 60(b) cannot be applied in this circumstance.

14          Those are the Attorney General's opinions.  They

03:56:58  15  are not what the law says.  Let me start with reasonable time

16  under 60(c)(1).  Mr. Ottoway cites Clark v. Davis.  Clark v.

17  Davis, he says, only triggers from Trevino or not at all.  That

18  is not what Clark says.

19          Clark says that the trigger can either be

03:57:21  20  appointment of conflict-free counsel like our appointment in

21  October the 23rd and November the 21st of this year or it can be

22  the Trevino decision date.  And unfortunately, because I don't

23  have that case in front of me, I can't point you to a pincite.

24          THE COURT:  You can send it to me.

03:57:44  25          MR. FREIMAN:  I would be happy to send it to your

Honor.

Second, the idea that there is a defect in the integrity of the proceedings because of federal habeas counsel's conflict, that does make our case a true 60(b); and we do not intend to file new claims as they did in Clark. Therefore, we will be raising a true 60(b).

The claim that I have just described to you is the nullification claim. It is an ineffective assistance of trial counsel claim regarding the nullification. That claim was raised initially in this court but treated as defaulted. It is the exact kind of claim that this Court can hear.

THE COURT: It's been done. I'm not going to rehear the next ten years of this case.

MR. FREIMAN: This issue has never been presented to you, your Honor. And so, all we ask is for one fair shot at it.

THE COURT: Wait. You just said there was a ruling.

MR. FREIMAN: Of default. You have never reached the merits of the issue; and that is what 60(b) is for, your Honor. All we're asking for is that --

THE COURT: Is to reopen everything.

MR. FREIMAN: To reopen this one claim.

THE COURT: No. You want to reopen one this way and one the other way.

MR. FREIMAN: Your Honor, we have no other way. As Mr. Schaffer presented to you, this is the way. This is the

1   only claim because it is the only claim that is a defaulted

2   ineffective assistance of trial counsel claim that was raised in

3   the initial proceedings and that we can now develop because we

4   can attack the ineffectiveness of state habeas counsel in a way

03:59:29   5   that Mr. Schaffer, unfortunately, could not because he was that

6   state habeas counsel.  That's the only issue that we are talking

7   about in our 60(b), and that is a true 60(b).

8            Now, finally, they're going to say that you have

9   no ability to do this because there are no extraordinary

03:59:54   10   circumstances; and all I ask on that, your Honor, is that you

11   give us the opportunity to show you what we think is so

12   extraordinary.

13            That is a decision for you and you alone,

14   entrusted to your equitable discretion; and it can't be

04:00:08   15   prejudged by the Attorney General without any presentation in

16   briefing.  And so, if that --

17       THE COURT:  Why isn't that barred by all the

18   proceedings that have gone up?  I ruled.  I said it was barred.

19   I got affirmed?

04:00:29   20       MR. FREIMAN:  Yes, your Honor.

21       THE COURT:  And it got affirmed by that other place?

22       MR. FREIMAN:  Yeah.  And in each of those stages, had

23   conflict-free counsel been appointed, they could have raised it

24   and tackled that claim earlier.  We could have dealt with this

04:00:44   25   long ago.  But both Mr. Schaffer and the Attorney General have

1   never raised this to your attention, and I am honestly at a

2   loss.

3           THE COURT:  How could I rule it was defaulted if they

4   didn't raise it to my attention?

04:01:01   5           MR. FREIMAN:  Never raised Mr. Schaffer's potential

6   conflict of interest to your attention.  That would have allowed

7   us to -- would have --

8           THE COURT:  We weren't here.

9           MR. FREIMAN:  -- would have allowed some conflict-free

04:01:12   10  counsel to present the issue to you for merits review.

11          THE COURT:  And what would you have said five years

12  ago, six years ago?

13          MR. FREIMAN:  Just the same thing, your Honor.  What I

14  said now.  Trial counsel advocated his role with ignorance of

04:01:31   15  the law and, in combination with his inadequate mitigation

16  investigation, essentially, sent his client down the river and

17  didn't do what he was required to do.  That's what we would have

18  told you then.

19          THE COURT:  Since that's a slavery reference, you

04:01:47   20  might not want to do that.

21          MR. FREIMAN:  Is that the origin?  I'm sorry, your

22  Honor.  I didn't realize.  I thought it was a reference to Sing

23  Sing Prison in New York.

24          THE COURT:  It would be up river.

04:02:01   25          MR. FREIMAN:  It would be up river.  You're right,

upstate.

THE COURT:  No.  It's if you were a bad slave in the upper slave regions, they would send you down the river because the large yellow fever-saturated plantations in Louisiana and Mississippi were great consumers of human beings.  And so, the threat was "If you don't act right in Missouri, we'll just send you down river."

MR. FREIMAN:  Yes, your Honor.  I am learning so much about American history today.  I apologize again for my ignorance.

THE COURT:  That's all right.  I've lived 180 years of it.

MR. FREIMAN:  The last point I want to raise is that we are here, as Mr. Mallett said, on the basis of an appointment and a motion for stay based on the appointment alone and that we should be permitted to finish this investigation.

There has been a substantial amount of work done by our team and that hasn't been done by any prior counsel.

THE COURT:  What have you found?

MR. FREIMAN:  Your Honor, we found confirmation of the drug abuse.

THE COURT:  Who -- what kind of a confirmation?  Don't give me a generalization.

MR. FREIMAN:  Your Honor, I am reluctant to do so in the presence of the Attorney General.

1           THE COURT:  You're going to have to tell them what the

2   evidence is because you're going to tell me.

3           MR. FREIMAN:  But I'm telling you it's not fully baked

4   yet, your Honor.  We should leave it in the oven.

04:03:52   5           THE COURT:  So, you have half-baked evidence.

6           MR. FREIMAN:  We have more than -- well, I didn't say

7   that.  I said I stuck a toothpick in, and there's still more

8   time.  But that's the nature of these investigations, your

9   Honor.  Federal habeas counsel had 22 years with this client.

04:04:08   10           THE COURT:  Most of the time, if you have a habeas

11  corpus, you got something that's outrageous and you come in and

12  you say:  Look, Judge, there's this, this, and this and this;

13  and I need another couple of months to find out about this, this

14  and this.  But to say, "Just give me another 90 days, I can find

04:04:23   15  a bunch of stuff out," it is not convincing.

16           MR. FREIMAN:  Okay.

17           THE COURT:  You know, a habeas corpus is invented for

18  a case where there is an obvious outrageous --

19           MR. FREIMAN:  Yes, your Honor.

04:04:39   20           THE COURT:  And this case has been litigated and

21  litigated and litigated.  You won some; you lost some.  And now,

22  you can't tell me about the facial outrageous anything.

23           MR. FREIMAN:  I can, your Honor.  I apologize.  If --

24  if we're going to cut through all this, yes.  You've already

04:04:59   25  mentioned, at least, one issue, which is the allegation of

1 serious sexual abuse of our client as a child.

2     THE COURT: By whom?

3     MR. FREIMAN: That is the question, your Honor.

4     THE COURT: So, you got a rumor?

04:05:17 5     MR. FREIMAN: That's all we have. And we have -- and

6 we presented that to you in our ex parte filing.

7     THE COURT: You already had evidence that he had been

8 hit in the head with a baseball bat and he had been in a car

9 wreck and hit his head. And we already had the evidence that he

04:05:36 10 was raised in -- to call it an unstable home would be

11 charitable.

12     MR. FREIMAN: Yes, your Honor.

13     THE COURT: And that's already said.

14     MR. FREIMAN: And that is not the evidence that I --

04:05:43 15     THE COURT: It's a product of our warped drug laws.

16     MR. FREIMAN: Right. Your Honor -- and so, the other

17 thing -- the other area of evidence that -- an investigation

18 that we are in the process of completing but haven't is this

19 issue of his drug abuse at the time, at the time of the offense;

04:06:03 20 and that is the kind of evidence that is extremely mitigating

21 and not just because --

22     THE COURT: Wait, wait, wait. In your mind, yes. I'm

23 supposed to look at it like a reasonable person; and the fact

24 that "I got high and shot a cop behind the head twice after I'd

04:06:22 25 already shot him in the stomach," normal people don't find that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  mitigating at all.

2     MR. FREIMAN:  Your Honor --

3     THE COURT:  It's -- if in his childhood he was given

4  drugs by his mother and he used them or resold them, that might

04:06:37  5  be mitigating.

6     MR. FREIMAN:  Yes.  And that is the picture that we're

7  trying to present is that this drug use was the product of that

8  lifelong history of trauma and abuse, as you well said, your

9  Honor; and --

04:06:52  10     THE COURT:  No, I didn't say the murder of the police

11  officer --

12     MR. FREIMAN:  No.

13     THE COURT:  -- was the product.

14     MR. FREIMAN:  No.

04:06:58  15     THE COURT:  I didn't say it caused drug use.  I said

16  it is bleak and sad for kids to do that.

17     MR. FREIMAN:  Yes, your Honor.

18     THE COURT:  And there are thousands, hundreds of

19  thousands, millions of children from seriously defective homes

04:07:17  20  in which there is abuse, sexual and otherwise, that grow up to

21  be productive, kind, generous, contributing citizens.

22     MR. FREIMAN:  Yes.

23     THE COURT:  And to say anybody who had some hiccups,

24  however substantial, in their childhood should be forgiven their

04:07:35  25  trespasses when they're like this is -- it's an unfair statement

1  of the causation and what people are responsible for themselves.

2  MR. FREIMAN:  Well, I said it was extremely mitigating

3  not because it was, in that sense, mitigating.  I meant that

4  because it could have diminished his culpability at the time of

04:08:03  5  the offense, and that is really core evidence that a jury would

6  have wanted to hear at the time they were making the decision

7  whether he should live or die.

8  Did he -- was he able to form the intent, the

9  deliberation based on his drug use?  That is --

04:08:20  10  THE COURT:  That's not mitigation.  I don't know what

11  you called it, but he's saying he didn't have the intention to

12  do it is.  It was all a mistake.

13  MR. FREIMAN:  No, not a legal mistake, your Honor, in

14  the sense of he is not guilty.  It was drug abuse that caused

04:08:41  15  lower levels of intent; and at the time -- this is how you know.

16  THE COURT:  They got to find he intended, right?

17  MR. FREIMAN:  Exactly.  At the time, the first

18  question they were asked:  Was this done with deliberate intent?

19  If he had abused drugs and was on them at the time --

04:08:57  20  THE COURT:  What's the standard -- wait.  What's the

21  standard for that?

22  MR. FREIMAN:  The standard, your Honor?

23  THE COURT:  You knew the nature and consequences of

24  your act.

04:09:05  25  MR. FREIMAN:  It's not a voluntariness issue at the

1   punishment phase, your Honor.

2          THE COURT:  No, no.  You're saying -- if it's intent,

3   it's the same intent -- what intent is diluted because you're on

4   drugs?

04:09:31   5          MR. FREIMAN:  Well, I can only appeal to common sense,

6   your Honor.  If I am drinking a beer and I, you know, do

7   something, the next day I don't say, "Well, I did that with full

8   intent."  I say, "I wasn't able to form my ordinary level of

9   deliberation when I did that."

04:09:50  10          THE COURT:  Sure, you will.  Because you knew when you

11  drink you're irresponsible and slobber all over yourself.

12          MR. FREIMAN:  That's right, your Honor.  And Texas law

13  has frequently separated out the issue of voluntary intoxication

14  from this issue, which is were you high and unable to form the

04:10:17  15  requisite intent?  And that was something the jury could have

16  heard and should have heard.

17          THE COURT:  We don't treat people who are on drugs and

18  kill people in a car wreck the same we do people who drink and

19  kill people in car wrecks?

04:10:33  20          MR. FREIMAN:  I can't speak to that question, but I am

21  speaking right now --

22          THE COURT:  Mr. Mallett, do you know anything about

23  that?

24          MR. MALLETT:  Are you asking about Texas law?

04:10:40  25          THE COURT:  Yes, sir.

          MR. MALLETT:  I think that Texas law generally holds a

person responsible for voluntary intoxication and the

consequences of it.  We have an intoxication manslaughter

statute so that you get more punishment than if you just have an

04:10:57  accident because you're listening to football and not watching

where you're going.  That's my opinion of the law.  The Attorney

General may have a different view.

          MR. FREIMAN:  And your Honor, that's exactly right.

That goes to the guilt or innocence.

04:11:14  THE COURT:  Or people who commit suicide after

watching University of Texas football?  But it would apply to

drugs, too.  Self-dehabilitation (phonetic spelling).

          MR. MALLETT:  In terms of what is a proper consequence

having been found guilty under Texas law, we have a bifurcated

04:11:30  system.  Likewise, in capital cases, we have a bifurcated system

so that the subject matter of intoxication, by whatever means,

may not provide a defense to criminal responsibility; but it may

be admissible to be considered by the punisher in deciding

what's appropriate.

04:11:51  THE COURT:  I'm pretty sure that doesn't work very

well.

          MR. MALLETT:  Well, actually, it probably doesn't work

perfectly.  But it is --

          THE COURT:  No.  I mean --

04:12:01  MR. MALLETT:  It's what we have to help 12 people

1  decide whether they unanimously believe a person should be

2  executed.

3          THE COURT:  Well, drop it down from the death penalty;

4  but in your ordinary DWI -- and I don't know.  I had one where

04:12:23  5  the Defendant was drunk at the time, and she filed a habeas

6  because she claimed she was too drunk to help her counsel at the

7  trial.  I didn't buy that.

8          MR. MALLETT:  I'm not surprised.

9          THE COURT:  It was very sad.  The victim of the car

04:12:50  10  was the second child of a two-child couple who had been killed

11  by a drunk driver.  That may have been offered in

12  contra-mitigation.

13              All right.

14          MR. FREIMAN:  I don't have any further clarifications

04:13:14  15  or rebuttal with regard to what Mr. Ottoway said.

16          THE COURT:  You've probably talked long enough that

17  Ottoway --

18          MR. FREIMAN:  I have talked long enough.  Thank you

19  for your leniency, Judge.

04:13:23  20          THE COURT:  Mr. Ottoway, do you want to say anything

21  else?

22          MR. OTTOWAY:  I would like a short reply, if I may,

23  your Honor.

24          THE COURT:  Certainly.

04:13:30  25          MR. OTTOWAY:  And I'm looking at my computer.  Do you

1  mind if I stay here, your Honor?

2          THE COURT:  As long as you speak up.

3          MR. OTTOWAY:  I absolutely will, your Honor.

4              With respect to the nullification issue that we

04:13:39  5  have talked about, they are correct that in 2001 the Supreme

6  Court found that the nullification instruction was

7  unconstitutional.  But that's not the question with respect to

8  ineffective assistance of trial counsel.

9              At the time that Penry I came out in 1989 during

04:13:57  10  the trial, the question was is how do we give effect to that?

11  An incorrect guess does not make trial counsel wrong.  And so,

12  the issue decided in Penry II in 2001 is not whether trial

13  counsel is ineffective for purposes of guessing wrong, it's that

14  the mitigation special instruction couldn't consider or did not

04:14:18  15  provide a vehicle to consider mitigating evidence.

16              Those are two distinct issues, and Penry II is

17  not decisive with respect to ineffective assistance of trial

18  counsel.  And I would also add that that claim was presented in

19  the second state habeas application, and the Court of Criminal

04:14:35  20  Appeals denied it.

21              When it came to Federal Court, there was a

22  slightly different take on that claim; and that's what made it

23  procedurally defaulted.  However, that claim was adjudicated by

24  the Court of Criminal Appeals in the -- I guess the naked

04:14:50  25  version of it where it was just "You should have presented a

better instruction."  So, I don't believe the Court can reach
that given that prior adjudication.

    With respect to Rule 60(b) timeliness, the <u>Clark</u>
case is what was being cited and what I cited; and I have a copy
of it; and I would be glad to provide that to you.  But I would
like to read a very short portion of it:  "Clark contends that
the relevant date for determining timeliness of his Rule
60(b)(6) motion is the date on which the Federal District Court
permitted new counsel to be substituted for Henry," Henry, an
attorney who was conflicted as a result of <u>Martinez</u>, <u>Trevino</u>,
"which was May 19, 2014.

    "The Federal District Court disagreed, concluding
that," quote, "Rule 60(c) timeliness requirements are not reset
every time a litigant obtains a new attorney," end quote, "and
reasoned that the motion was filed," quote, "more than 15 months
after <u>Trevino</u> was decided" end quote.  We agree with this
analysis."

    That is <u>Clark</u>.  That is determinative on the
timeliness issue.  And I will provide a copy to the Court.

    THE COURT:  Please.

    MR. OTTOWAY:  May I approach, your Honor?

    THE COURT:  Yes.

    MR. FREIMAN:  Your Honor, may we have a copy?

    MR. OTTOWAY:  I do not have an additional copy, your
Honor.

1         I can provide you the cite to it.

2         THE COURT:  Please.

3         MR. OTTOWAY:  It's Clark v. Davis, 850 F3d 770;

4 pincite, 782.

04:16:24  5         THE COURT:  Thank you.

6         MR. OTTOWAY:  Thank you, your Honor.

7             And then, again, with respect to any of these

8 issues about additional abuse or sexual assault as a child or

9 the extent of the drug use, we have final judgment in this case.

04:16:45 10 It would be second or successive, and the Court couldn't reach

11 it even if the Court were to consider a Rule 60(b)(6) motion

12 regarding conflicted counsel.

13            And other than that, your Honor, I would rest --

14 oh, one more point, your Honor.  With respect to this request

04:17:04 15 for an additional 90 days after the capital habeas unit was

16 appointed, one of their own exhibits that they have presented to

17 you is the Gutierrez case from the Fifth Circuit.  I believe

18 it's Exhibit D on their reply to our opposition to a stay.

19            I might be incorrect on that exhibit; but it says

04:17:24 20 that if a 90-day stay were to be granted, it would be based on

21 the initial attorney -- non-conflicted attorney in that case.

22 And in this case, if the Court were to agree with that position,

23 as the Fifth Circuit has said is the correct position, then a

24 stay would only be permitted to January 21st, I believe; and

04:17:48 25 that would not stop the execution.

1        THE COURT:  The 22nd.  The 21st is a holiday.

2        MR. OTTOWAY:  Then, I stand corrected, your Honor; but

3    that would not stop a January 30th execution.  And so, I have

4    nothing further and would rest on the brief, your Honor.

04:18:03    5        THE COURT:  All right, thank you.

6            Counsel, thank you very much.

7        MR. FREIMAN:  Thank you, your Honor.

8        MR. OTTOWAY:  Thank you.

9        MR. MALLETT:  Thank you, your Honor.

04:18:10   10        MR. SCHARDL:  If I may, one point of distinction, your

11   Honor?

12        THE COURT:  Sure.

13        MR. SCHARDL:  The difference in Gutierrez is that

14   there the second lawyer was local counsel for out-of-state

04:18:21   15   lawyers.  Here, the Court has found that Mr. Mallett was unable

16   to fulfill the responsibilities under 3599.  So, the Court

17   didn't actually complete counsel -- counsel under McFarland and

18   3599 until our appointment in November.  It's a drastic --

19        THE COURT:  I concluded that Mr. Mallett is perfectly

04:18:43   20   capable of doing nearly everything, but he deserved some help.

21   That's a different proposition.

22            Now, Mr. Ottoway and his team, I don't know how

23   many people it would take; but the conclusion was Mr. Mallett

24   deserves help.  He undertakes tough cases, short notice, and

04:19:08   25   does a beautiful job.  I didn't declare him non compos mentis.

1          All right.  Thank you, counsel.

2      (Proceedings concluded at 4:19 p.m.)

3

4

5

6                  C E R T I F I C A T E

7

8      I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter, to

10  the best of my ability.

11

12  By: /s/*Gayle L. Dye*_____          *01-22-2019*_____

13          Gayle L. Dye, CSR, RDR, CRR       Date

14

15

16

17

18

19

20

21

22

23

24

25